FILED
United States Court of Appeals
Tenth Circuit

**July 12, 2016**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

PLANNED PARENTHOOD
ASSOCIATION OF UTAH,

     Plaintiff-Appellant,

v.

GARY R. HERBERT, in his official
capacity as Governor of the State of
Utah; JOSEPH K. MINER, M.D., in
his official capacity as Executive
Director of the Utah Department of
Health,

     Defendants-Appellees.

No. 15-4189

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:15-CV-00693-CW)**

---

Peggy A. Tomsic, (Christine T. Greenwood and Jennifer Fraser Parrish, with her on the briefs) of Magleby, Cataxinos & Greenwood, Salt Lake City, Utah, for Plaintiff-Appellant.

Tyler R. Green, (Parker Douglas and Stanford E. Purser, with him on the brief), Office of the Attorney General for the State of Utah, Salt Lake City, Utah, for Defendants-Appellees.

---

Before **BRISCOE, EBEL** and **BACHARACH**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

Plaintiff Planned Parenthood Association of Utah (PPAU) filed this action pursuant to 42 U.S.C. § 1983 claiming that defendant Gary Herbert, the Governor of the State of Utah, violated PPAU's constitutional rights by directing defendant Joseph Miner, the Executive Director of the Utah Department of Health (UDOH), to stop UDOH from acting as an intermediary for so-called "pass-through" federal funds that PPAU uses to carry out certain programs in the State of Utah. Along with its complaint, PPAU filed a motion seeking a temporary restraining order (TRO) and a preliminary injunction. Although the district court initially issued a TRO, it ultimately withdrew the TRO and denied PPAU's request for a preliminary injunction. PPAU filed this interlocutory appeal challenging the denial of its motion for preliminary injunction. We granted a stay in favor of PPAU to prevent the cessation of funding during the pendency of this appeal, and we also expedited the briefing and oral argument schedule. Now, exercising jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), we reverse the decision of the district court and remand with instructions to grant PPAU's motion for preliminary injunction.

# I

## *Factual background*

### a) *Planned Parenthood Association of Utah and its activities*

PPAU is a non-profit corporation organized under the laws of the State of

Utah. PPAU is an affiliate of, but legally separate from, Planned Parenthood Federation of America, Inc. (Planned Parenthood).

For nearly fifty years, PPAU has provided reproductive health services to women, men, and teenagers in the State of Utah. PPAU delivers these services directly through its network of nine urban and rural clinics and indirectly through contracts with eleven rural and frontier providers who act on PPAU's behalf. PPAU is currently the only statewide organization that provides reproductive health services to anyone who requests them. More specifically, PPAU provides services without regard to a patient's health insurance status, socioeconomic status, race, or ethnicity.

In 2011, PPAU began offering abortion services. PPAU does not receive any funds from either the federal government or state government for abortion services. PPAU complies with all federal and state laws regarding the disposal of fetal tissue, and it does not allow its patients to donate fetal tissue after an abortion.

During its 2015 fiscal year, PPAU provided health care services to 46,082 patients, 46% of whom reported being uninsured. Nearly 45,000 of these total patients sought and received services unrelated to abortion, such as the provision of birth control, vasectomy, pregnancy testing, screenings for sexually-transmitted diseases (STDs), cancer screenings, and cancer prevention. Over 17,000 of the total patients either asked to be tested for, or were identified as at

risk for having contracted, chlamydia and/or gonorrhea. Of this group, approximately 72% reported being uninsured.

In addition to medical services, PPAU provides a variety of education services related to reproductive health, including abstinence education, contraceptive education, and STD education.

*b) PPAU's relationship with the Utah Department of Health*

UDOH is a department of the State of Utah created pursuant to Utah Code § 26-1-4. UDOH is the health, health planning, and medical assistance authority of the State of Utah and, as such, is the sole agency that oversees the administration of federally-assisted state programs or plans for public health, health planning, maternal and child health, services for children with a disability, and medical assistance.

PPAU has received federal funding to support its reproductive health services and education since approximately 1973. Since 1993, PPAU has received federal funds through programs administered by the State of Utah.[1] At issue in this case are two grants, one contract, and one letter of understanding, pursuant to which UDOH dispenses federal funds, either directly or indirectly, to PPAU. PPAU in turn uses that funding for four specific types of programs. The details of this funding are outlined in detail below.

---

[1] According to the limited record on appeal, approximately one-third or less of PPAU's annual operating budget derives from federal, state, or local government funding.

4

*c) Targeted STD testing*

Since the early 1990s, PPAU has worked in collaboration with UDOH to carry out the Communicable Disease Prevention Program for STD Testing in the State of Utah.  Federal funds are used to pay the Utah Public Health Laboratory for specimens to be tested for STDs.  As part of this program, UDOH has provided PPAU, at no charge, with prescription medications needed to treat chlamydia and gonorrhea.  This has enabled PPAU, in turn, to provide treatment free of charge to all patients who test positive, as well as to their partners.

The most recent manifestation of this collaboration is a letter of understanding entered into between UDOH and PPAU in early 2015.  Pursuant to that letter of understanding, UDOH agreed to "pay the Utah Public Health Laboratory on [PPAU's] behalf . . . for 4,400 specimens from January 1, 2015, through December 31, 2015 for STD testing for" the following classes of Utah residents: (1) "[f]emales 15 to 24 years of age"; (2) "[t]he partners of females 15 to 24 years of age, regardless of the partner's age"; and (3) "[m]en who have sex with men."  App. at 149.

*d) STD Surveillance Network*

In 2013, UDOH asked PPAU to participate in a five-year project called the STD Surveillance Network.  The purpose of the project was to update the surveillance systems at UDOH to improve data gathering and STD prevention outcomes across the State of Utah.  Funding for the Network was provided by the

5

Centers for Disease Control (CDC).

The parties' agreement was formalized by contract on March 3, 2014. The contract period was to run from March 3, 2014, until September 30, 2018. Under the terms of the contract, UDOH agreed to pay PPAU $30,000 in federal funds in exchange for PPAU's work on the project. In early February 2015, the contract was amended to increase the amount of federal funds provided by UDOH to PPAU from $30,000 to $109,960.

*e) Utah Abstinence Education Program*

On or about April 1, 2011, UDOH issued a grant to PPAU so that PPAU could carry out the Utah Abstinence Education Program (UAEP). The original amount of the grant was for $221,546.20, and was intended to cover the period from April 1, 2011, to September 30, 2014. The grant was subsequently amended to provide total funding in the amount of $338,386.55, and to extend the grant period until September 30, 2016.

In carrying out the UAEP, PPAU provides after-school abstinence education to teenagers in the State of Utah. The program requires parental permission to enroll. In PPAU's fiscal year 2015, 98 teenagers signed up for the program and 44 teenagers graduated from the program.

*f) The Personal Responsibility Education Program*

In 2013, UDOH sought competitive bids from entities in the state interested in carrying out the State's Personal Responsibility Education Program (PREP).

6

Funding for the PREP program came from the United States Department of Health and Human Services, Administration on Children, Youth and Families. The purpose of PREP "is to educate adolescents on both abstinence and contraception to prevent pregnancy and [STDs], including HIV/AIDS." Id. at 275. In addition, PREP is intended to educate adolescents on "the following three adulthood preparation subjects": (1) "[h]ealthy relationships, such as positive self-esteem and relationship dynamics"; (2) "[e]ducational and career success, such as developing skills for employment preparation, job seeking, independent living, financial self-sufficiency, and work-place productivity"; and (3) "[h]ealthy life skills, such as goal-setting, decision making, negotiation, communication and interpersonal skills, and stress management." Id. "The target population for [PREP] is Utah youth ages 14-19 with a specific focus on youth in the Utah Juvenile Justice System, youth of Hispanic origin and/or non-white race, current teen moms, and youth residing in areas with birth rates higher than Utah's state rate." Id.

PPAU was the winning bidder on the project. According to PPAU, it was awarded a three-year grant from UDOH, good through 2016, with the possibility of signing new contracts for additional years.

*g) The release of the CMP videos*

In the summer of 2015, an entity known as the Center for Medical Progress (CMP) released "selectively edited videos of Planned Parenthood staff members

7

discussing the health care provider's fetal tissue donation program." Id. at 398.

The videos resulted in "[a]nti-abortion advocates . . . accusing Planned

Parenthood of profiting off the sale of fetal tissue, which would be illegal." Id.

In turn, "[m]ultiple investigations were launched in Congress and in the states."[2]

Id.

      *h) Defendant Herbert's response to the CMP videos - the Directive*

      Defendant Gary Herbert is the Governor of the State of Utah and, in that

capacity, serves as the Chief Executive Officer for the State of Utah. On August

14, 2015, Herbert, in response to the CMP videos, issued a written statement

(Directive) that stated:

> The allegations against Planned Parenthood are deeply troubling.
> Current Utah state law prohibits the use of state funds to provide
> abortions by Planned Parenthood or any other organization. The
> federal government has provided grants to Planned Parenthood,
> distributed through the Utah Department of Health. These funds are
> also prohibited from being used to perform abortions. In light of
> ongoing concerns about the organization, I have instructed state
> agencies to cease acting as an intermediary for pass-through federal
> funds to Planned Parenthood.

Id. at 51.[3] The Directive was specifically directed at federal funding that flowed

---

[2] According to the limited information available in the record, to date none of these investigations have "turned up . . . evidence that Planned Parenthood was doing anything other than receiving legal reimbursements for the cost of processing the donations" of fetal tissue. App. at 398. No evidence was found to support the CMP videos' claim that fetal tissue was being sold by Planned Parenthood.

[3] In referring to "Planned Parenthood," the Directive did not distinguish
(continued...)

8

through UDOH to PPAU for the UAEP program, the PREP program, the Targeted STD Testing program, and the STD Surveillance Network.  The Directive also "purport[ed] to affect reimbursements made to PPAU for pregnancy and STD testing for victims of rape or sexual assault through the Utah Office for Victims of Crime."  Id. at 14.

Herbert followed the Directive with a press conference on August 17, 2015, during which he stated, "We now have video where they're selling fetus body parts for money and it's an outrage and the people of Utah are outraged.  I'm outraged.  So for coloring outside the lines, [PPAU] forfeits some of their benefits."  Id. at 11.  Herbert conceded during the press conference, however, "that none of the alleged conduct occurred in Utah."  Id. at 12.

On August 19, 2015, Herbert participated in a group protest, held in the rotunda of the Utah State Capitol, to ask state lawmakers to defund PPAU.  During the protest, Herbert stated: "I'm here today to add my voice to yours and speak out on the sanctity of life . . . ."  Id. at 11.  Herbert further stated: "The thing I find most appalling is the casualness, the callousness . . . the lack of respect, the lack of sensitivity to the unborn . . . ."  Id.

*i) UDOH's response to the Directive*

Defendant Joseph Miner, M.D., the Executive Director of UDOH, acting

---

[3](...continued)
between the national organization and PPAU.

9

pursuant to defendant Herbert's Directive, instructed his subordinates at UDOH to implement the Directive. Consequently, on September 8, 2015, UDOH provided PPAU with a thirty-day written notice of termination of its contract for the UAEP program. On that same date, UDOH also provided PPAU with notice that UDOH would cease accepting funds from the CDC for the STD Surveillance Network contract after September 29, 2015. UDOH also informed PPAU that reimbursement for specimens sent by PPAU to the Utah Public Health Laboratory for STD testing would cease after December 31, 2015. Finally, UDOH publicly stated that it intended to allow its contract with PPAU for the PREP program to expire without renewal on September 30, 2015.

*j) PPAU's conduct*

It is undisputed that at no time has PPAU been accused of misusing funds, including using the funds at issue to perform abortion services. Further, it is undisputed that at no time has UDOH complained about the services provided by PPAU, or otherwise claimed that PPAU was not qualified to provide services. It is also uncontroverted that PPAU has no direct connection to any of the activities allegedly depicted in the CMP videos.

*Procedural background*

PPAU initiated this action on September 28, 2015, by filing a complaint pursuant to 42 U.S.C. § 1983 for declaratory and injunctive relief against defendants Herbert and Miner. The complaint set forth three claims for relief.

10

Count 1 alleged a violation of equal protection under the Fourteenth Amendment. More specifically, Count 1 alleged that "[d]efendants' actions in singling out PPAU for unfavorable treatment without adequate justification violate[d] PPAU's rights as guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution." Id. at 19–20. Count 2 alleged that "[d]efendants' actions violate[d] the rights of PPAU as guaranteed by the First Amendment to the United States Constitution by imposing a penalty based on its speech and/or associations without adequate justification." Id. at 20. Count 3 alleged that "[d]efendants' actions violate[d] the rights of PPAU and its patients as guaranteed by the Fourteenth Amendment to the United States Constitution to provide and access abortion services by imposing a penalty on PPAU for the provision of and/or association with abortion services without adequate justification." Id. at 21. The complaint sought declaratory relief, a preliminary and permanent injunction, and a judgment awarding PPAU its costs of suit, including reasonable attorneys' fees.

Along with its complaint, PPAU filed a motion for temporary restraining order (TRO) and preliminary injunction. PPAU argued that there was a substantial likelihood that it would succeed on the merits of its claims, that it would suffer irreparable injury if an injunction did not issue, that the threatened injury to it outweighed any damage that an injunction might cause to the defendants, and that issuance of an injunction would not be adverse to the public

11

interest.

The following day, September 29, 2015, the district court held a hearing on PPAU's motion for TRO. No evidence was presented during the hearing; instead, the parties agreed to have the district court decide the motion upon the facts deemed by defendants to be admitted. At the conclusion of the hearing, the district court granted a TRO in favor of PPAU.

On October 15, 2015, the district court held a hearing on PPAU's motion for preliminary injunction. Again, no testimony was presented at the hearing. The parties instead relied exclusively on documentary evidence: PPAU submitted a lengthy declaration from Karrie Galloway, the president and CEO of PPAU; defendants submitted affidavits from Shari Watkins, UDOH's finance director, and Austin Cox, defendant Herbert's constituent services director, as well as documents submitted in connection with Watkins' affidavit pertaining to each of the UDOH/PPAU programs that were intended to be defunded. Notably, no evidence was submitted from defendant Herbert discussing or explaining his decision to issue the Directive.

On December 22, 2015, the district court issued a memorandum decision and order denying PPAU's motion for preliminary injunction and vacating the previously issued TRO. Shortly thereafter, PPAU filed a timely notice of interlocutory appeal.

**II**

In this appeal, PPAU challenges the district court's denial of its motion for preliminary injunction. "We review the denial of a preliminary injunction for abuse of discretion." Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1128 (10th Cir. 2013), aff'd sub nom Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751 (2014). "A district court abuses its discretion by denying a preliminary injunction based on an error of law." Id. To the extent the district court made factual findings as part of its ruling, see Fed. R. Civ. P. 52(a)(2), we review those "factual findings under the deferential 'clear error' standard," Glossip v. Gross, 135 S. Ct. 2726, 2739 (2015); see Fed. R. Civ. P. 52(a)(6).

Federal Rule of Civil Procedure 65(a) authorizes district courts to issue preliminary injunctions. A plaintiff "seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

*Likelihood of success on the merits*

"The very purpose of an injunction under Rule 65(a) is to give temporary relief based on a preliminary estimate of the strength of the plaintiff's suit, prior to the resolution at trial of the factual disputes and difficulties presented by the case." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal

13

Practice and Procedure, § 2948.3, at 213-14 (2013).  Although "[t]he courts use a bewildering variety of formulations of the need for showing some likelihood of success," id. at 197, "[a]ll courts agree that plaintiff must present a prima facie case but need not show a certainty of winning," id. at 201.

In analyzing whether PPAU has established a likelihood of success on the merits, we shall address separately each of the three claims asserted in its complaint.  As discussed below, we conclude that PPAU has failed to establish a likelihood of success on the merits of its equal protection claim, but has established a likelihood of success on the merits of its unconstitutional conditions claims.

*a) Equal protection claim*

It is undisputed that Count 1 of PPAU's complaint, particularly when considered together with PPAU's motion for preliminary injunction, asserts a so-called "class-of-one" equal protection claim.  More specifically, Count 1 of PPAU's complaint alleges that "[d]efendants' actions in singling out PPAU for unfavorable treatment without adequate justification violate[d] PPAU's rights as guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution."  App. at 19–20.  In its simultaneously-filed motion for preliminary injunction, PPAU argued that Herbert "has singled out PPAU and is treating it differently than all other federal grant recipients for reproductive health services."  Dist. Ct. Docket No. 3 at 3.  PPAU in turn argued that "[t]he

14

State lacks any compelling, or even legitimate, governmental interest for distinguishing between [PPAU] and other federal grant recipients providing reproductive health services and education who have and will be approved for receiving federal funds administered by the State, and whose existing contracts were not terminated or rejected for renewal." Id. at 4–5. PPAU concluded by arguing that "[t]his disparate treatment is a violation of PPAU's constitutional rights under the Equal Protection Clause of the Fourteenth Amendment." Id.

In Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000), the Supreme Court held that the Equal Protection Clause gives rise to a cause of action even if a plaintiff does not belong to a particular class or group. To prevail on this class-of-one theory, a plaintiff must allege and prove (1) "that [it] has been intentionally treated differently from others similarly situated" and (2) "that there is no rational basis for the difference in treatment." Id. In other words, the "paradigmatic" class-of-one case arises when "a public official inflicts a cost or burden on one person without imposing it on those who are similarly situated in material respects, and does so without any conceivable basis other than a wholly illegitimate motive." Jicarilla Apache Nation v. Rio Arriba Cnty., 440 F.3d 1202, 1209 (10th Cir. 2006). We have emphasized that a class-of-one plaintiff must identify others "similarly situated in every material respect." Id. at 1210. "Depending on the case and the nature of the differential treatment, the allegations necessary to establish this level of similarity will vary." Haik v. Salt

15

Lake City Corp., 567 F. App'x 621, 632 (10th Cir. 2014) (citing Jennings v. City of Stillwater, 383 F.3d 1199, 1214 (10th Cir. 2004)).  A class-of-one claim fails if there is "either a rational basis for the [challenged] treatment" or "a material difference" between the plaintiff and others who were allegedly similarly situated. Jicarilla, 440 F.3d at 1210.

Defendants argue, as a threshold matter, that PPAU cannot establish a likelihood of success on the merits of its class-of-one equal protection claim because the claim is effectively precluded by the Supreme Court's decision in Engquist v. Oregon Dep't of Agriculture, 553 U.S. 591 (2008).  At issue in Engquist was "whether a public employee can state a claim under the Equal Protection Clause by alleging that she was arbitrarily treated differently from other similarly situated employees, with no assertion that the different treatment was based on the employee's membership in any particular class."  553 U.S. at 594.  The Supreme Court concluded, based upon its "traditional view of the core concern of the Equal Protection Clause as a shield against arbitrary classifications, combined with unique considerations applicable when the government acts as employer as opposed to sovereign, . . . that the class-of-one theory of equal protection does not apply in the public employment context."  Id. at 598.

In reaching this conclusion, the Court explained that it "ha[s] long held the view that there is a crucial difference, with respect to constitutional analysis,

16

between the government exercising 'the power to regulate or license, as lawmaker,' and the government acting 'as proprietor, to manage [its] internal operations.'" Id. (quoting Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 896 (1961)). As a result, the Court noted, it "ha[s] often recognized that government has significantly greater leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large." Id. at 599. The Court emphasized that its "precedent in the public employee context . . . establishes two main principles." Id. at 600. "First, although government employees do not lose their constitutional rights when they accept their positions, those rights must be balanced against the realities of the employment context." Id. "Second, in striking the appropriate balance, [the Court] consider[s] whether the asserted employee right implicates the basic concerns of the relevant constitutional provision, or whether the claimed right can more readily give way to the requirements of the government as employer." Id.

Continuing, the Court noted that its "[r]ecognition of the class-of-one theory of equal protection on the facts in Olech was not so much a departure from the principle that the Equal Protection Clause is concerned with arbitrary government classification, as it was an application of that principle." Id. at 602. Olech, the Court noted, "involved the government's regulation of property," and "the cases upon which [it] . . . relied concerned property assessment and taxation schemes." Id. "[S]uch legislative or regulatory classifications," the Court stated,

17

are "expect[ed] . . . to apply without respect to persons."  Id. (internal quotation marks omitted).  Thus, the Court stated, "[w]hen those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to ensure that all persons subject to legislation or regulation are indeed being treated alike, under like circumstances and conditions."  Id. (internal quotation marks omitted).  And, the Court emphasized, "[w]hat seems to have been significant in Olech and the cases on which it relied was the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed."  Id.  For example, the Court noted, "[t]here was no indication in Olech that the zoning board was exercising discretionary authority based on subjective, individualized determinations—at least not with regard to easement length, however typical such determinations may be as a general zoning matter."  Id. at 602–03.

The Court then concluded that "[t]here are some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments."  Id. at 603.  "In such cases," the Court held, the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted."  Id.  "In such situations," the Court explained, "allowing a challenge based on the arbitrary singling out of a particular person would

18

undermine the very discretion that such state officials are entrusted to exercise." Id.

Ultimately, the Court concluded that "[t]his principle applies most clearly in the employment context, for employment decisions are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." Id. at 604. The Court stated that, "[u]nlike the context of arm's-length regulation, such as in Olech, treating similarly situated individuals differently in the employment context is par for the course." Id. "Thus," the Court held, "the class-of-one theory of equal protection—which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review—is simply a poor fit in the public employment context." Id. at 605. "To treat employees differently," the Court stated, "is not to classify them in a way that raises equal protection concerns." Id. "Rather," the Court stated, "it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship." Id. And, the Court stated, "[a] challenge that one has been treated individually in this context, instead of like everyone else, is a challenge to the underlying nature of the government action." Id.

As noted, the defendants in this case argue that Engquist should be extended to government contractors, such as PPAU. They argue that the principles that motivated the Supreme Court's decision in Engquist apply with

19

equal force to government contractors.  We have not directly addressed this issue

before.  But, to date, four other circuits—the First, Seventh, Eighth, and Eleventh

Circuits—have extended Engquist beyond the context of government employment.

See Caesars Mass. Mgmt. Co. v. Crosby, 778 F.3d 327, 336–37 (1st Cir. 2015)

(applying Engquist to preclude four corporate plaintiffs from asserting an equal

protection claim arising out of a decision by the Massachusetts Gaming

Commission finding them unsuitable as proposed operators of a casino); Srail v.

Village of Lisle, 588 F.3d 940, 944–45 (7th Cir. 2009) (extending Engquist to

preclude equal protection claim filed by residents of an incorporated subdivision

claiming that the village in which they resided violated the Equal Protection

Clause by refusing to supply water to subdivisions and schools attended by their

children at adequate firefighting pressure and volume); Flowers v. City of

Minneapolis, 558 F.3d 794, 799–800 (8th Cir. 2009) ("In light of Engquist, . . .

we conclude that while a police officer's investigative decisions remain subject to

traditional class-based equal protection analysis, they may not be attacked in a

class-of-one equal protection claim."); United States v. Moore, 543 F.3d 891, 901

(7th Cir. 2008) (extending Engquist to preclude class-of-one claims challenging

prosecutorial decisions); Douglas Asphalt Co. v. Qore, Inc., 541 F.3d 1269, 1274

(11th Cir. 2008) ("We have little trouble applying the reasoning in Engquist . . .

to the circumstances in this case involving a government-contractor

relationship."); but see Analytical Diagnostic Labs, Inc. v. Kusel, 626 F.3d 135,

20

142–43 (2d Cir. 2010) (refusing to extend Engquist to a claim challenging the state's exercise of "its regulatory and licensing power"); Hanes v. Zurick, 578 F.3d 491, 495–96 (7th Cir. 2009) (refusing to extend Engquist to bar class-of-one claim alleging that defendant police officers repeatedly arrested plaintiff without cause).

Arguably, the most relevant of these circuit cases is Douglas. There, a highway paving contractor filed suit against Georgia state officials alleging that they violated his equal protection rights by wrongly singling it out and treating it differently than other, similarly-situated paving contractors. The Eleventh Circuit concluded "that Engquist [was] control[ling] . . . and ma[de] clear that [the contractor] failed to assert a cognizable right to equal protection." 541 F.3d at 1274. The Eleventh Circuit explained:

> In Board of County Commissioners v. Umbehr, 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996), the [Supreme] Court addressed whether independent contractors may bring a § 1983 retaliation claim when a government entity has acted against the contractor's exercise of free speech. Id. at 671–73, 116 S.Ct. at 2345–46. Having never addressed the issue in the independent contractor context, the Court applied its government employment precedents to the question. Id. at 673–74, 116 S.Ct. at 2346–47. It did so because of the "obvious" similarities between government employees and government contractors with respect to the issue. Id. at 674, 116 S.Ct. at 2347. Specifically, the Court explained that "[t]he government needs to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy, and responsiveness of service to the public, and to prevent the appearance of corruption." Id. at 674, 116 S.Ct. at 2347. The Court further articulated that "absent contractual, statutory, or constitutional restriction, the government is entitled to terminate [employees and contractors] for

21

no reason at all." Id.

> Just as in the employee context, and in the absence of a restricting contract or statute, decisions involving government contractors require broad discretion that may rest "on a wide array of factors that are difficult to articulate and quantify." Engquist, 128 S.Ct. at 2154.

Id.

In our view, Douglas's reliance on Umbehr is entirely reasonable. In Umbehr, the Supreme Court stated that "[i]ndependent contractors appear to us to lie somewhere between the case of government employees, who have the closest relationship with the government, and our other unconstitutional conditions precedents, which involve persons with less close relationships with the government." 518 U.S. at 680. Ultimately, however, the Court rejected the notion that "there is a 'difference of constitutional magnitude' between independent contractors and employees in this context." Id. at 684 (internal citation omitted) (quoting Lefkowitz v. Turley, 414 U.S. 70, 83 (1973)). The Court explained that "[i]ndependent government contractors are similar in most relevant respects to government employees, although both the speaker's and the government's interests are typically—though not always—somewhat less strong in the independent contractor case." Id.

In light of Umbehr and Douglas, a relatively strong case can be made that we should follow suit and extend Engquist to cases involving claims asserted by government contractors, unless, of course, there is some unique aspect of the case

22

that would take it outside this general rule. Generally speaking, when the government deals with its contractors, it is not acting as sovereign, but rather in a role that is in many ways similar to that of employer. See SECSYS, LLC v. Vigil, 666 F.3d 678, 690 (10th Cir. 2012) (noting that "the government acts in a more proprietorial and less regulatory capacity" when it deals with independent contractors). And, in that role, "[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated . . . to a significant one." Engquist, 553 U.S. at 598. Further, in dealing with its contractors, the government is often called upon to make judgments that are "subjective and individualized." Id. at 604. In other words, the government is often called upon in this context to "exercise the broad discretion that typically characterizes the [contractee-contractor] relationship." Id. at 605. All of which leaves no "clear standard against which departures . . . c[an] be readily assessed." Id. at 602.

We need not, however, definitely resolve the Engquist issue at this very early stage of the litigation. Instead, we simply conclude that PPAU has failed to establish a likelihood of success on the merits of the Engquist issue. In reaching this conclusion, we emphasize that the record on appeal contains no evidence regarding how the State of Utah typically deals with contractors, such as PPAU, with respect to contracts involving federal funding.[4] Perhaps there is little to no

---

[4] Contrast that, for example, with the decision in Planned Parenthood Greater Memphis Region v. Dreyzehner, 853 F. Supp. 2d 724 (M.D. Tenn. 2012).

(continued...)

23

discretion afforded the State of Utah regarding these contracts and their termination. But all that is contained in the record on appeal are the specific contracts at issue between PPAU and the State of Utah. And as to those contracts, there is no evidence regarding whether PPAU competitively bid for them or whether, instead, PPAU was awarded the contracts through other methods. Further, although PPAU refers to other, similarly-situated contractors in the State of Utah who provide reproductive-related services, there is literally no evidence in the record on appeal regarding these other contractors. For this reason alone, we conclude that PPAU has failed to satisfy its burden of establishing a likelihood of success on the Engquist issue.

Even assuming, for purposes of argument, that we were to reject the defendants' Engquist argument, we would still conclude that PPAU has failed to establish a substantial likelihood of demonstrating that it was "arbitrarily treated differently from other similarly situated" government contractors. Engquist, 553 U.S. at 594. "[W]e have recognized a substantial burden that plaintiffs" asserting a class-of-one claim "demonstrate others similarly situated in all material respects were treated differently and that there is no objectively reasonable basis for the defendant's action." Kan. Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1217

---

[4](...continued)
In that case, the district court was presented with detailed information regarding how federal grants are awarded to recipients in the State of Tennessee. Id. at 727–28.

24

(10th Cir. 2011) (quotation marks omitted). "It is therefore imperative for the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the favored class." Jennings v. City of Stillwater, 383 F.3d 1199, 1214 (10th Cir. 2004).

PPAU has failed to meet this substantial burden, at least at this point in the litigation. Although PPAU repeatedly refers, both in its district court pleadings and in its appellate brief, to other, similarly-situated "pass-through funding recipient[s]" in the State of Utah, it fails to specifically identify a single one of them in any of its pleadings. Aplt. Br. at 43. And, relatedly, there is literally no evidence in the record on appeal regarding the State of Utah's contracts or dealings with contractors other than PPAU.[5] PPAU's failure in this regard leaves us with no standard against which we can compare Herbert's actions towards PPAU. The result is that PPAU has failed to establish a substantial likelihood of success on the merits of its class-of-one equal protection claim.

*b) Unconstitutional conditions claims*

PPAU asserted two unconstitutional conditions claims in its complaint. To begin with, Count 2 of PPAU's complaint alleged that "[d]efendants' actions violate[d] the rights of PPAU as guaranteed by the First Amendment to the United

---

[5] Again, contrast that with the record in Dreyzehner, where the Planned Parenthood organization in that case presented the district court with information regarding a "dozen or so similarly-situated service providers whose contracts were approved." 853 F. Supp. 2d at 737.

25

States Constitution by imposing a penalty based on its speech and/or associations without adequate justification." App. at 20. In support, PPAU alleged that it "advocates for access to abortion" and "associates with" others to do the same. Id. at 14. PPAU also alleged in its motion for preliminary injunction that its "association with other Planned Parenthood providers who participate in lawful programs that allow abortion patients to donate fetal tissue for scientific research . . . is protected by the First Amendment," and that Herbert's Directive was intended to punish PPAU for this association. Dist. Ct. Docket No. 3 at 3. Finally, at the hearing on its motion for preliminary injunction, PPAU again argued that the Directive infringed upon its First Amendment rights to advocate for legal abortions and associate with other organizations for political, social, and education reasons. App. at 475–76.

Count 3 of PPAU's complaint also alleged an unconstitutional conditions claim. It alleged that "[d]efendants' actions violate[d] the rights of PPAU and its patients as guaranteed by the Fourteenth Amendment to the United States Constitution to provide and access abortion services by imposing a penalty on PPAU for the provision of and/or association with abortion services without adequate justification." App. at 21. At the hearing on its motion for preliminary injunction, PPAU explained that it has a constitutional right to provide facilities for women who choose to exercise their substantive due process rights under the Fourteenth Amendment to have legal abortions. Id. at 476.

26

The Supreme Court "ha[s] said in a variety of contexts that 'the government may not deny a benefit to a person because he exercises a constitutional right.'" Koontz v. St. Johns River Water Mgmt. Dist., 133 S. Ct. 2586, 2594 (2013) (quoting Regan v. Taxation With Representation of Wash., 461 U.S. 540, 545 (1983)). "Those cases reflect an overarching principle, known as the unconstitutional conditions doctrine, that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." Id.

The Supreme Court "has applied this doctrine in two distinct contexts." Planned Parenthood of Kan. v. Moser, 747 F.3d 814, 838 (10th Cir. 2014). "First, the doctrine has been applied when the condition acts prospectively in statutes or regulations that limit a government-provided benefit—typically a subsidy or tax break—to those who refrain from or engage in certain expression or association." Id. at 838–839. "Second, the unconstitutional-conditions doctrine has been applied when the condition acts retrospectively in a *discretionary* executive action that terminates a government-provided benefit—typically public employment, a government contract, or eligibility for either—in retaliation for prior protected speech or association." Id. at 839

This latter context is exemplified by Umbehr. There, the Court applied the doctrine in concluding that "the First Amendment protects independent contractors from the termination of at-will government contracts in retaliation for

27

their exercise of the freedom of speech." 518 U.S. at 670. The Court in turn held that the "balancing test" outlined in Pickering v. Board of Education of Township High School District 205, 391 U.S. 563, 568 (1968), "adjusted to weigh the government's interests as contractor rather than as employer, determines the extent of [the independent contractor's] protection." 518 U.S. at 673. To prevail under this balancing test, the Court held, the independent contractor "must show that the termination of his contract was motivated by his speech on a matter of public concern." Id. at 685. "If he can make that showing," the Court held, the government "will have a valid defense if it can show, by a preponderance of the evidence, that, in light of [its] knowledge, perceptions, and policies at the time of the termination, [it] would have terminated the contract regardless of the [contractor's] speech." Id. The government "will also prevail," the Court stated, "if it can persuade the . . . [c]ourt that the [government]'s legitimate interests as contractor, deferentially viewed, outweigh the free speech interests at stake." Id.

PPAU's unconstitutional conditions claims appear to us to fit comfortably within the context exemplified by Umbehr. As previously noted, PPAU has alleged in those claims that Herbert took a discretionary executive action, i.e., issuing the Directive, that terminated PPAU's contractual relationships with UDOH and was motivated by PPAU's engagement in the following activities: "associat[ing] with other Planned Parenthood providers who participate in lawful programs that allow abortion patients to donate fetal tissue for scientific

28

research," Dist. Ct. Docket No. 3 at 3; advocating for legal abortions, App. at 475; associating with organizations for political, social and education reasons, id. at 476; and providing abortion services to its patients.

Defendants do not dispute that Herbert issued the Directive or that its effect would be to terminate PPAU's contracts with UDOH. Defendants do dispute, however, whether PPAU engaged in activities protected by the First Amendment and whether Herbert's issuance of the Directive was motivated by either PPAU's exercise of its First Amendment or Fourteenth Amendment rights. We therefore address these issues in turn.

In challenging whether PPAU engaged in any First Amendment-protected activities, defendants argue that no court has ever held that the "fundamental right to abortion includes the right to sell fetal tissue." Dist. Ct. Docket No. 19 at 19. Defendants also argue that no court has "extend[ed] th[e] First Amendment right of association to encompass the right to associate in furtherance of illegal acts such as selling fetal tissue." Id. These arguments, however, miss the mark. Quite simply, PPAU has never alleged that it possessed or exercised any such rights.

Focusing on the First Amendment rights that PPAU has actually identified in Count 2 of its complaint, we have little trouble in concluding that they are valid. "The First Amendment creates 'an open marketplace' in which differing ideas about political, economic, and social issues can compete freely for public

29

acceptance without improper government interference." Knox v. Serv. Emp. Int'l Union, Local 1000, 132 S. Ct. 2277, 2288 (2012) (quoting New York State Bd. of Elections v. Lopez Torres, 552 U.S. 196, 208 (2008)). "The government may not prohibit the dissemination of ideas that it disfavors, nor compel the endorsement of ideas that it approves." Id. "And the ability of like-minded individuals to associate for the purpose of expressing commonly held views may not be curtailed." Id. PPAU has alleged consistently, without dispute from defendants, that it advocates for abortion rights and associates with other entities, including Planned Parenthood, to do the same.

PPAU has also alleged in Count 3, without serious challenge from defendants, a Fourteenth Amendment right. The Supreme Court has recognized that "the Fourteenth Amendment's concept of personal liberty and restrictions upon state action . . . encompass[es] a woman's decision whether or not to terminate her pregnancy." Roe v. Wade, 410 U.S. 113, 153 (1973). The Court has also recognized that, "because abortion is a medical procedure, . . . the full vindication of the woman's fundamental right necessarily requires that her" medical provider be afforded the right to "'make his best medical judgment,'" which includes "implementing [the woman's decision] should she choose to have an abortion." City of Akron v. Akron Ctr. for Reprod. Health, Inc., 462 U.S. 416, 427 (1983) (quoting Doe v. Bolton, 410 U.S. 179, 192 (1973)), overruled on other grounds by Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833 (1992); see also

30

Planned Parenthood of Mid-Mo. and E. Kan., Inc. v. Dempsey, 167 F.3d 458, 464

(8th Cir. 1999) ("Any constitutional right of clinics to provide abortion services .

. . is derived directly from women's constitutional right to choose abortion.");

Planned Parenthood of Wis. v. Doyle, 162 F.3d 463, 471 (7th Cir.1998) ("The

constitutional right to an abortion carries with it the right to perform medical

procedures that many people find distasteful or worse.").

Having determined that PPAU has identified valid First and Fourteenth

Amendment rights, that leaves the question of whether PPAU can establish that

Herbert issued the Directive in retaliation for PPAU's exercise of those rights.

The district court concluded that PPAU failed to establish a likelihood of success

on this point and offered the following rationale in support of its conclusion:

> Plaintiff contends that Governor Herbert's opposition to abortions
> and Plaintiff's association with other pro-choice entities was the
> substantial or motivating force behind his directive to terminate the
> contracts. It points to the Governor's participation in an anti-
> abortion protest mere days after his press release, during which he
> said he was there to speak out for the sanctity of life. These facts
> fall short of proving, however, that Governor Herbert's opposition to
> abortion was a substantial or motivating factor for terminating the
> contracts.
>
> Gary Herbert has been the Governor of Utah for the past six
> years. Although Plaintiff has been associated with other pro-choice
> entities since Governor Herbert took office and it started performing
> abortions in Utah in 2011, the Governor still allowed the Department
> to enter into and maintain contracts with Plaintiff. It was not until
> the videos were released that the Governor acted to terminate the
> contracts. Indeed, Plaintiff alleges and the defendants do not dispute
> that the Governor said, "We now have video where they're selling
> fetus body parts for money and it's an outrage and the people of Utah

31

are outraged. I'm outraged. So for coloring outside the lines, [Plaintiff] forfeits some of [its] benefits." Complaint, ¶ 14 (Dkt. No. 2). Both the Governor's words and the temporal proximity between the release of the videos and his directive to terminate the contracts support he did not retaliate against Plaintiff based upon its right of association nor its right to advocate for and perform abortions. Therefore, the court concludes Plaintiff is unlikely to prevail on its unconstitutional condition claims.

App. at 494–495.

We conclude that the district court's analysis is unconvincing.[6] Focusing on what the district court described as "the Governor's words," id. at 495, the Directive itself repeatedly refers to PPAU as "Planned Parenthood," states that "[t]he allegations against Planned Parenthood are deeply troubling," notes that "[t]he federal government has provided grants to Planned Parenthood, distributed through the Utah Department of Health," and ultimately states that Herbert "instructed state agencies to cease acting as an intermediary for pass-through federal funds to Planned Parenthood." App. Vol. 1 at 51. The Directive thus fails to distinguish between PPAU and Planned Parenthood (or, for that matter,

_____

[6] As we read the above-quoted language, the district court was merely assessing the limited evidence presented by the parties and determining, as a matter of law, whether PPAU had established a likelihood of succeeding on its unconstitutional conditions claim. Indeed, it would have been unusual for the district court to make a factual finding on this key issue, given the procedural posture of the case, the fact that no witnesses testified at the preliminary injunction hearing, and the fact that Herbert has not been deposed yet. See Wright et al., supra, § 2950, at 271-72 ("it is inappropriate for the court at a Rule 65(a) hearing to make findings of fact or conclusions of law that go beyond what is necessary to decide whether a preliminary injunction should be issued"). In any event, even assuming that the district court intended to make a factual finding on this issue, we conclude that such finding was clearly erroneous.

Planned Parenthood affiliates in other states) and treats PPAU as if it were the entity implicated in the CMP videos. In other words, reading the Directive in isolation, it appears as though Herbert mistakenly believed that PPAU was implicated in the CMP videos and deserved to be punished for its apparent misconduct.

The same can be said for much of Herbert's post-Directive statement to the press on August 17, 2015. There, Herbert stated that "[w]e now have video where they're selling fetus body parts for money and it's an outrage." Id. at 56. Herbert further stated that "it happened in their organization" and "for coloring outside the lines, Planned Parenthood forfeits some of their benefits." Id. In short, these statements to the press again failed to distinguish between PPAU and Planned Parenthood (or Planned Parenthood's affiliates in other states) and suggested either that Herbert believed that PPAU was involved in the wrongdoing depicted by the CMP videos or failed to appreciate the organizational distinctions between PPAU, Planned Parenthood, and Planned Parenthood's other affiliates.

If that were all the evidence we had before us, we would thus be left to conclude that the most reasonable finding a court or jury could make is that the Directive was issued based upon a mistake of fact made by Herbert, rather than upon any motivation by Herbert to punish PPAU for its First or Fourteenth Amendment activities. But PPAU has presented additional evidence which leads us to a different conclusion.

During the press conference on August 17, 2015, Herbert acknowledged that the events depicted in the video "may not have happened in Utah." Id. And in opposing PPAU's motion for preliminary injunction in the district court, Herbert made more specific admissions.[7] To begin with, he admitted that the CMP videos involved other affiliates of Planned Parenthood and not PPAU. Id. at 12; Dist. Ct. Docket No. 19 at ix. Herbert further admitted that "there is no evidence, or even accusation, that PPAU has 'colored outside' of any lines, including because PPAU does not participate in any program that provides fetal tissue for scientific research." App., Vol. 1 at 12; Dist. Ct. Docket No. 19 at ix. Herbert also admitted that none of the federal funds that flow through the UDOH to PPAU are "used to provide abortions." App., Vol. 1 at 12; Dist. Ct. Docket No. 19 at ix. In addition, Herbert admitted that the accusations made by CMP in

---

[7] The dissent attempts to downplay this evidence, stating that it derives in part from "excerpts from PPAU's unsworn complaint," which the dissent asserts "is not evidence," and also from what the dissent characterizes as "an excerpt from the defendants' brief in district court opposing PPAU's motion for preliminary injunction." Dissent at 7. In fact, it is the combination of the two documents that renders these so-called "excerpts" relevant. To begin with, PPAU's complaint contains numerous factual allegations regarding Herbert's issuance of the Directive. App., Vol. 1 at 11-14. Defendants, in their memorandum in opposition to PPAU's motion for preliminary injunction, stated: "For only the purposes of this brief opposing [PPAU's] motion for preliminary injunction, Governor Herbert does not dispute the factual allegations in paragraphs 12 through 22 of [PPAU's] Complaint describing his response to the [CMP] videos." Dist. Ct. Docket No. 19 at ix. In other words, Herbert admitted the factual allegations contained in paragraphs 12 through 22 of PPAU's complaint for purposes of the preliminary injunction proceedings. Thus, contrary to the dissent's assertion, it is proper for us to treat these admissions as evidence.

the videos regarding Planned Parenthood and its other affiliates had not been proven and indeed were false. App., Vol. 1 at 11-12; Dist. Ct. Docket No. 19 at ix. Lastly, Herbert essentially agreed that the national "political climate . . . [wa]s very hostile to Planned Parenthood." App., Vol. 1 at 3; Dist. Ct. Docket No. 19 at viii-ix. Nevertheless, Herbert has steadfastly refused to retract the Directive. App., Vol. 2 at 394, 396.

PPAU also points to Herbert's participation in a pro-life event held in the rotunda of the Utah State Capitol on August 19, 2015, five days after he issued the Directive. The purpose of the event was "to ask lawmakers to defund [PPAU]." App., Vol. 1 at 59. During the event, Herbert made two statements to the crowd regarding abortion. To begin with, Herbert stated, "I'm here today to add my voice to yours and speak out on the sanctity of life." Id. Herbert then stated, "The thing I find most appalling is the casualness, the callousness . . . the lack of respect, the lack of sensitivity to the unborn." Id. at 11.

Considering all of this evidence together, we conclude that a reasonable finder of fact is more likely than not to find that Herbert issued the Directive to punish PPAU for the First and Fourteenth Amendment rights it has identified in this litigation. In particular, we conclude that a reasonable finder of fact is more likely than not to find that Herbert, a politician and admitted opponent of abortion, viewed the situation that presented itself by release of the CMP videos as an opportunity to take public action against PPAU, deprive it of pass-through

35

federal funding, and potentially weaken the organization and hamper its ability to provide and advocate for abortion services. This seems especially true given Herbert's concession that the allegations made by CMP are unproven and in fact false, and in light of the current political climate, including the efforts by abortion opponents both in the State of Utah and nationally to defund Planned Parenthood and its affiliates.

Of course, that leaves the possibility that defendants can assert a valid defense to the unconstitutional conditions claims asserted by PPAU. As we previously noted, defendants "will have a valid defense if [they] can show, by a preponderance of the evidence, that, in light of [their] knowledge, perceptions, and policies at the time of the termination, [they] would have" issued the Directive "regardless of" PPAU's First and Fourteenth Amendment activities. Umbehr, 518 U.S. at 685. Second, defendants can "also prevail if [they] can persuade [us] that [their] legitimate interests as contractor, deferentially viewed, outweigh the free speech interests at stake." Id.

Notably, defendants have never attempted, either below or on appeal, to invoke either of these defenses. Specifically, as to the first defense, defendants have never asserted that Herbert would have issued the Directive absent the release of the CMP videos. As for the second defense, defendants did argue in their response to the motion for preliminary injunction that "[a] contractor's undisputed affiliation with a group alleged to be engaged in such illegal activity

36

is 'a reasonable justification' for terminating the contract," Dist. Ct. Docket No. 19 at 15 (quoting Kansas Penn Gaming, 656 F.3d at 1216), "to prevent the very 'appearance of corruption' Utah is entitled to avoid," id. (quoting Umbehr, 518 U.S. at 674). But that argument was asserted only in the section addressing PPAU's class-of-one equal protection claim and was not repeated in the section addressing the unconstitutional conditions claims. Moreover, the argument is not repeated in the defendants' appellate brief. As a result, we conclude, for purposes of this appeal, that defendants have not adequately raised the argument in opposition to the unconstitutional conditions claim.

In summary, we conclude that PPAU has established a substantial likelihood of success on the merits of its unconstitutional conditions claims and that the district court erred in concluding otherwise.

*Likelihood of irreparable harm to PPAU*

"'A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain.'" Awad v. Ziriax, 670 F.3d 1111, 1131 (10th Cir. 2012) (quoting Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d 1149, 1156 (10th Cir. 2001)). "When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." Kikumura v. Hurley, 242 F.3d 950, 963 (10th Cir. 2001) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice

37

and Procedure § 2948.1 (2d ed. 1995)). Indeed, the Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1975).

The district court in this case concluded that PPAU failed to establish the likelihood of irreparable harm. The district court based this conclusion primarily on its determination that PPAU "likely will not be able to show it suffered a constitutional harm." App. at 495. The district court also stated that "[a]ny financial harm [PPAU] has suffered from the contracts' termination can be redressed." Id. Finally, the district court rejected PPAU's argument that it would "suffer irreparable reputational harm if an injunction did not issue." Id. In doing so, the district court noted that there was evidence in the record "that many people have spoken out in favor of [PPAU] following the Governor's pronouncement." Id.

We reject most of the district court's analysis on this issue. To begin with, we conclude that PPAU has, in fact, demonstrated a substantial likelihood of success on the merits of its unconstitutional conditions claims. We in turn conclude that the likelihood that PPAU will suffer a violation of its First Amendment rights if the Directive is left in place, standing alone, gives rise to an irreparable injury. See Elrod, 427 U.S. at 373; Kikumura, 242 F.3d at 963 (reaching similar conclusion). More specifically, we conclude that "[d]amages

38

would [likely] be inadequate or difficult to ascertain" for such a constitutional violation. Awad, 670 F.3d at 1131 (quoting Dominion, 269 F.3d at 1156).

As for the financial harm that PPAU would incur as a result of the Directive, i.e., the loss of the federal funds it would have received pursuant to the terms of the contracts at issue, the district court was correct that these damages could be redressed (although that would, as a result of the Eleventh Amendment, have to be in a state court action filed by PPAU). See Heideman v. Salt Lake City, 348 F.3d 1182, 1189 (10th Cir. 2003) ("[E]conomic loss usually does not, in and of itself, constitute irreparable harm.").

But the district court was also wrong in concluding that there was no likelihood of harm to PPAU's reputation. Contrary to the district court's assertion, the fact that approximately 1,800 Utah residents sent correspondence to Herbert in favor of PPAU following his issuance of the Directive does not eliminate the likelihood of irreparable harm to PPAU's reputation. As noted by PPAU, "there are over two million Utah citizens," meaning that the small amount of correspondence that Herbert received from PPAU supporters was "a drop in the bucket." Aplt. Br. at 69. Further, we conclude that the Directive could, due in part to its ambiguity, reasonably be interpreted by many Utah residents as an indication that PPAU was somehow involved with the CMP videos or was otherwise engaged in the selling of fetal tissue. And we agree with PPAU that, as a provider of medical services, its "reputation is . . . critical to maintaining the

39

trust of its patients." Dist. Ct. Docket No. 3 at 16.

Finally, the district court wholly ignored PPAU's argument that the Directive "threaten[ed] to irreparably harm [PPAU]'s ability to serve the high-risk men, women, and teens and their parents, all of whom are the subjects and recipients of the programs that the Governor's Directive directly affects." Id. More specifically, PPAU argued that the Directive "threaten[ed] to increase unwanted pregnancies among these groups, as well as [to] increas[e] the risk that these patients will contract and/or transmit potentially life-threatening STDs." Id. Because, however, these arguments appear to be focused on the impact of the Directive on the public as opposed to PPAU itself, they will be considered below in connection with our analysis of the public interest requirement.

In sum, we conclude that PPAU has established a likelihood that it will suffer irreparable reputational harm if a preliminary injunction is not issued.

*Does the harm alleged by PPAU outweigh any harm to defendants?*

In analyzing this factor, the district court began by noting that the Directive "did not terminate [PPAU] as a Medicaid provider" or "preclude [PPAU] from advocating for or performing abortions." App. at 496. The district court also noted that "the defendants have not sought to preclude [PPAU] from receiving funding directly from the federal government, as [it] has done in the past." Id. The district court then turned to the defendants' interests and concluded that if they were "enjoined from terminating the contracts, their authority to manage

40

their affairs will be curtailed." Id.  The district court also concluded that an injunction would "deprive the defendants of their contractual right to terminate the contracts at will." Id.  In addition, the district court concluded that "continuing to allow [PPAU] to provide services under the auspices of the contracts may reasonably be perceived by the citizenry of Utah as approbation of the wrongful conduct" allegedly engaged in by Planned Parenthood.  Id.  In other words, the district court concluded, "[t]he defendants have discretion under the contracts to consider whether continuation of them would send a message that wrongful conduct is acceptable." Id. at 497.  Because "[t]here is no monetary remedy for such injuries," the district court concluded, "the injuries to defendants outweigh the injuries to [PPAU]." Id.

The threshold, and ultimately critical, flaw in the district court's analysis is that it failed to take into account PPAU's likelihood of success on the merits of its unconstitutional conditions claim and the resulting likelihood of irreparable harm to PPAU.  In our view, the possibility of PPAU's First Amendment rights being irreparably harmed outweighs any opposing interests asserted by defendants.

To the extent that the district court suggested PPAU could replace the funding from other sources, we conclude that there is no basis in the record to support such a conclusion.  According to PPAU, the programs at issue "are federally-funded, but administered by the State, and therefore, [it] cannot

41

participate in these programs except through UDOH." Aplt. Br. at 71-72. Indeed, PPAU alleges, the "UDOH unsuccessfully attempted to find a work-around [for the Directive] by which PPAU could obtain funding for the programs at issue directly from the federal government." Id. at 72.

Finally, we agree with PPAU that the issuance of a preliminary injunction in its favor would not infringe upon defendants' ability and right to manage the contracts at issue and, if necessary, to terminate them for a proper reason (i.e., any reason that would not result in a violation of PPAU's constitutional rights). Although defendants assert in response that an injunction would deprive them of "their discretion under the contracts to consider whether continuation of them would send a message that wrongful conduct is acceptable," again there is no evidence in the record, nor even any allegation, that PPAU has engaged in any wrongful conduct. Aplee. Br. at 55 (internal quotation marks omitted).

We therefore conclude that the potential harm to defendants from the issuance of an injunction does not outweigh the harm to PPAU that will likely result if the injunction is not issued.

*Is an injunction in the public interest?*

In addressing this factor, the district court acknowledged that "some members of the public may be harmed if the contracts terminate," but the court did not otherwise elaborate on this point. App. at 497. But "[b]alanced against this harm," the district court stated, "is the right of the elected Governor of this

42

State to make decisions about what is in the best interests of the State." Id. Because "[t]hese contracts relate to discretionary programs," the district court concluded, "[i]t is contrary to the public's interest to remove from the Governor the very discretion his position entails." Id. "Indeed," the district court concluded, "these are the types of decisions that should be left to elected officials and not managed by the courts." Id. Consequently, the district court "conclude[d] it is not in the public interest to enjoin the defendants from terminating the contracts at issue." Id.

We again reject the district court's analysis. In assessing this factor, the district court again failed to take into account PPAU's likelihood of success on its unconstitutional conditions claims. Assuming, for purposes of argument, that the Directive violates PPAU's First Amendment rights, the citizens of Utah have a public interest in ensuring that such an order is not enforced. In other words, the citizens of Utah have an interest in ensuring that their elected public officials do not engage in conduct that violates the constitutional rights of another citizen.

Further, although the district court conceded that some members of the public might be harmed by the Directive, it failed to give adequate consideration to this potential harm. Throughout the district court proceedings, defendants conceded the importance of the programs at issue to the citizens of Utah. But defendants argued in their response to PPAU's motion that Herbert issued the Directive only "after considering whether other available and adequate health

43

providers would provide these same services" to the citizens of Utah. Dist. Ct. Docket No. 19 at 26. At the hearing on the motion, however, defendants reversed course and conceded that, in fact, no other providers would be able to provide some of these same services. App. at 459-460. Notably, the district court made no mention of this fact in its decision.[8]

As PPAU notes in its motion, the Directive "threatens to increase unwanted pregnancies among the[] groups [served by the programs at issue], as well as [to] increas[e] the risk that these patients will contract and/or transmit potentially life-threatening STDs." Dist. Ct. Docket No. 3 at 16. This serious potential harm, particularly when combined with the potential violation of PPAU's constitutional rights, is sufficient to outweigh Herbert's interest in exercising his discretion to terminate the contracts at issue with PPAU, particularly given that the exercise of that discretion may violate PPAU's constitutional rights.

One final point merits discussion. We agree with defendants that "[w]here . . . the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" Rizzo v. Goode, 423 U.S. 362, 378 (1976) (quoting Stefanelli v. Minard, 342 U.S. 117,

---

[8] Likewise, the dissent states that "[t]he record . . . contains evidence that Governor Herbert thought that the directive would not harm Utah citizens." Dissent at 11 n.7 (citing a newspaper article quoting Herbert). Herbert's initial statements on this matter, however, are belied by defendants' subsequent concessions.

44

120 (1951)).  That concern was exemplified in <u>Rizzo</u>, where the plaintiffs sought the extreme measures of appointment of a receiver to supervise the Philadelphia police department and civilian review of police activity.  The requested injunctive relief in this case, in contrast, is much narrower in scope and does not, in our view, implicate the concerns raised in <u>Rizzo</u>.  Specifically, the requested injunction in this case would simply preserve the status quo until the merits of PPAU's claims can be litigated and would not otherwise prevent the defendants from administering the contracts at issue.

### III

For the reasons outlined above, we conclude that PPAU satisfied each of the four requirements for issuance of a preliminary injunction and that the district court abused its discretion in concluding otherwise.  Consequently, we REVERSE and REMAND with directions to issue a preliminary injunction in favor of PPAU.

*Planned Parenthood Association of Utah v. Herbert, et al.*, No. 15-4189

**BACHARACH**, J., concurring in part and dissenting in part.

The majority concludes that Planned Parenthood Association of Utah ("PPAU") has satisfied its burden on each of the four elements of the test for a preliminary injunction. Accordingly, the majority reverses and remands with instructions to grant PPAU's motion for a preliminary injunction. I join the majority's discussion of the equal protection claim. *See* Maj. Op. at 14-25. But I respectfully dissent from the majority's disposition of the claims involving unconstitutional conditions. On these claims, I believe that the district court acted within its discretion in concluding that PPAU had not shown a likelihood of success.[1]

PPAU's claims grew out of Governor Herbert's directive that the Utah Department of Health terminate its contractual relationships with PPAU. According to PPAU, this directive placed unconstitutional conditions on PPAU's exercise of its

1. First Amendment right to advocate for reproductive choice and associate with the national Planned Parenthood organization for purposes of pro-choice advocacy and

2. Fourteenth Amendment right to provide access to abortion services.

---

[1] In light of this conclusion on likelihood of success, I would decline to address the three other elements of the test for a preliminary injunction.

I believe that the district court acted within its discretion in concluding that PPAU had not shown a likelihood of success on the claims involving unconstitutional conditions.

**I.  We review the district court's decision for an abuse of discretion.**

We review the district court's ruling for an abuse of discretion. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). A district court abuses its discretion if it "commits an error of law, or is clearly erroneous in its preliminary factual findings." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1243 (10th Cir. 2001) (quoting *Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1155 (10th Cir. 1999)).

**II.  We should not relax PPAU's burden to demonstrate likelihood of success on the merits.**

PPAU urges us to relax the likelihood-of-success element. According to PPAU, it satisfied the other elements for a preliminary injunction, which softens the burden on likelihood of success to require only a showing that the issue is serious, substantial, difficult, and doubtful. Appellant's Opening Br. at 39-40. For this argument, PPAU relies on *Nova Health Systems v. Edmondson*, 460 F.3d 1295, 1298 n.6 (10th Cir. 2006). I

2

disagree because *Nova Health Systems* has been implicitly overruled by *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).[2]

Before *Winter* was decided, we held that the likelihood-of-success element is "somewhat relaxed" when the other three elements "tip *decidedly*" in favor of the movant. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (emphasis in original). This approach is no longer tenable in light of *Winter*. In *Winter*, the Supreme Court addressed the Ninth Circuit's relaxed standard for irreparable injury, which had required a movant to show only a "possibility" of irreparable injury if the movant demonstrated a strong likelihood of prevailing on the merits. *Winter*, 555 U.S. at 21. The Supreme Court rejected this relaxed standard as "too lenient." *Id.* at 22.

The Fourth Circuit Court of Appeals extended *Winter* to the likelihood-of-success inquiry, holding that the court could no longer apply a relaxed standard for likelihood of success. *Pashby v. Delia*, 709 F.3d 307, 320-21 (4th Cir. 2013). In dicta, the D.C. Circuit has likewise indicated that "a likelihood of success is an independent, free-standing requirement for a preliminary injunction." *Sherley v. Sebelius*, 644 F.3d

---

[2] The majority also requires proof of likelihood of success and has not applied the relaxed standard urged by PPAU. But because the majority concludes that PPAU is likely to succeed even under the traditional standard, the majority does not decide whether to relax PPAU's burden on likelihood of success.

3

388, 393 (D.C. Cir. 2011) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring)).

The Second, Seventh, and Ninth Circuits have upheld their relaxed likelihood-of-success standards in the face of *Winter*. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011); *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35-38 (2d Cir. 2010); *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009).

I disagree with these courts and agree with the Fourth Circuit and the D.C. Circuit. In *Winter*, the Supreme Court reasoned that

- "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction" and

- issuing a preliminary injunction after applying a less-demanding test is inconsistent with the Court's characterization that "injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

*Winter*, 555 U.S. at 22 (emphasis in original). In the same opinion, the Court reiterated that to obtain a preliminary injunction, a plaintiff must prove not only a likelihood of irreparable injury but also a likelihood of success on the merits. *Id.* at 20. And if the Court disallowed softening of the burden on irreparable injury because of the need for the movant to clearly show entitlement to a preliminary injunction, we should not allow entry of a preliminary injunction based only on a possibility of success on

4

the merits. *Winter* requires a movant to establish each of the four preliminary injunction elements and does not allow relaxation of the burden on one element based on the proof of another. Thus, I would decline to apply the relaxed standard in district court. There, PPAU had to show that it was likely to succeed on the merits.

## III. The district court acted within its discretion in concluding that PPAU was unlikely to persuade the jury that Governor Herbert had acted with a purpose of interfering with constitutionally protected conduct.

Applying the proper test, the district court concluded that PPAU was unlikely to succeed on the merits, reasoning that PPAU could not prove that Governor Herbert issued the directive as punishment for the exercise of constitutional rights. This ruling fell within the district court's discretion. *See Verlo v. Martinez*, 820 F.3d 1113, 1128 (10th Cir. 2016) (applying the abuse-of-discretion standard to the inquiry on likelihood of success).

As noted, PPAU claims that Governor Herbert put unconstitutional conditions on PPAU's exercise of

- its First Amendment rights to advocate for reproductive choice and associate with others in furtherance of such advocacy and

- its Fourteenth Amendment right to provide abortion-related services.

The First Amendment protects PPAU's pro-choice advocacy and association in furtherance of pro-choice advocacy. *See Hill v. Colorado*,

5

530 U.S. 703, 714-15 (2000); *City of Dallas v. Stanglin*, 490 U.S. 19, 24 (1989); *Planned Parenthood of Kan. and Mid-Mo. v. Moser*, 747 F.3d 814, 838-39 (10th Cir. 2014). And I assume, for the sake of argument, that PPAU has a Fourteenth Amendment right to provide abortion-related services. *Cf. Planned Parenthood of Mid-Mo. & E. Kan., Inc. v. Dempsey*, 167 F.3d 458, 464 (8th Cir. 1999) (stating that a Planned Parenthood affiliate's right to perform abortions "is derived directly from women's constitutional right to choose abortion").

At trial, PPAU would need to show that its protected conduct—advocacy for reproductive choice, association with pro-choice advocates, and provision of abortion services—was a substantial or motivating factor for Governor Herbert's directive. *See Moser*, 747 F.3d at 839. If PPAU had made this showing, the burden would shift to the defendants to show that the governor "would have taken the same action even in the absence of the protected conduct." *Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996).[3]

_____

[3] The majority contends that the "defendants have never asserted that Herbert would have issued the Directive absent the release of the CMP videos." Maj. Op. at 36. But the release of the videos is not the constitutionally protected conduct asserted by PPAU; the constitutionally protected conduct is PPAU's pro-choice advocacy, association with similar advocates, and provision of abortion services. Thus, the defendants must show that Governor Herbert would have issued the directive in the absence of PPAU's pro-choice speech, affiliations, and abortion services. The defendants argued throughout that Governor Herbert would have issued the directive regardless of the allegedly protected conduct. *See* Appellee's

6

The district court concluded that PPAU had failed to show that Governor Herbert's animus toward abortion was a substantial or motivating factor in issuing the directive. This conclusion fell within the district court's discretion. In determining PPAU's likelihood of success on the merits, the district court had little evidence to go on. Though PPAU bore the burden of proof on likelihood of success, PPAU presented no testimony at the preliminary injunction hearing. Based on the sparse record, the district court could easily conclude that Governor Herbert believed the allegations of illegality from the videos, just as he said he did.

The majority contends that Governor Herbert "admitted that the accusations made by [the Center for Medical Progress] in the videos regarding Planned Parenthood and its other affiliates had not been proven and indeed were false." Maj. Op. at 34-35. I respectfully disagree with this interpretation of the record.

For its interpretation of the record, the majority relies on (1) excerpts from PPAU's unsworn complaint and (2) an excerpt from the defendants' brief in district court opposing PPAU's motion for a preliminary injunction. *See id.* The unsworn complaint is not evidence. But even in the

Resp. Br. at 48 (arguing that the district court correctly concluded that PPAU's constitutional claims are not likely to succeed on the merits because "neither abortion itself, nor speaking about it, nor associating with others to advocate for it had anything to do with the Governor's decision"); Dist. Ct. Docket No. 19 at 28-30 (defendants making the same argument in response to PPAU's motion for a preliminary injunction).

7

complaint, PPAU does not allege that Governor Herbert conceded that the allegations were false. Instead, PPAU alleges only that Governor Herbert acknowledged that the conduct depicted in the videos had not taken place in Utah. Appellant's App'x, vol. I at 12. In addition, the majority cites page ix of the defendants' brief in district court, opposing PPAU's motion for a preliminary injunction. But this excerpt again does not suggest that Governor Herbert conceded that he had mistakenly interpreted the video evidence or that this evidence was false. Nowhere has PPAU presented evidence of a concession by Governor Herbert that the video evidence was false or misinterpreted.

Our task is not to assess the soundness of the governor's decision. Instead, we must decide whether the district court had the discretion to conclude that the fact-finder was likely to regard Governor Herbert's motivation as something other than punishment of PPAU for exercising its constitutional rights.

In my view, the district court did not abuse its discretion. This conclusion is supported by Governor Herbert's statements that the directive was based on videos depicting purportedly illegal activity by an affiliated entity.[4] Appellant's App'x, vol. 1 at 51 (Governor Herbert's

---

[4]   *The Salt Lake Tribune* also reported that Governor Herbert had said:

We now have a video where [Planned Parenthood is] selling fetus body parts for money and it's an outrage and the people

8

official public statement, following the directive).[5] Indeed, PPAU even alleged in the complaint that Governor Herbert had based his directive on allegations of misconduct against affiliates of Planned Parenthood. *Id.* at 7, 11.

PPAU points to Governor Herbert's contemporaneous acknowledgment that the pass-through funding was not used for abortion services, contending that the acknowledgment was unnecessary and served only to distance the directive from abortion. But PPAU provides no evidence to support this contention. In my view, the district court had the discretion to credit Governor Herbert's stated reason for issuing the directive.

As further evidence of pretext, PPAU points to the temporal proximity between the release of the videos and the directive, arguing that

---

of Utah are outraged. I'm outraged. So for coloring outside the lines, Planned Parenthood forfeits some of their benefits.

Appellant's App'x, vol. 1 at 56.

[5] The majority states that Governor Herbert apparently issued the directive based on a mistaken assumption that the video had involved PPAU's conduct. I respectfully disagree. The record reflects Governor Herbert's understanding from the outset that the video had depicted conduct by an affiliated Planned Parenthood chapter, not PPAU itself. *See* Appellant's App'x, vol. I at 56. But PPAU's claim involves reliance on unconstitutional conditions, not a mistake. Thus, the majority acknowledges that if Governor Herbert had issued the directive based on a mistake, the defendants would be likely to prevail on a claim of unconstitutional conditions. Maj. Op. at 33.

9

"Governor Herbert waited until the political moment was ripe to retaliate against PPAU." Appellant's Opening Br. at 64. The defendants interpret this temporal proximity as evidence that the governor was heavily influenced by the Center for Medical Progress videos. Rejecting this interpretation, the district court credited the defendants' explanation for the directive. That decision was reasonable and within the district court's discretion.

PPAU's only direct evidence is a memorandum of talking points for a pro-life event that Governor Herbert attended after issuing the directive. The talking points, which were drafted by Governor Herbert's staff, included statements that (1) the directive had been based on Governor Herbert's commitment to the "Right to Life" and (2) Governor Herbert had sent "a strong message" that "Utah values the sacred nature of human life." Appellant's App'x, vol. 2 at 391-92. But there is no evidence of Governor Hebert's approval or use of these talking points. *See* Oral Arg. at 14:15-15:08 (PPAU counsel admitting that Governor Herbert had not used the talking points and that the talking points had never been publicly released). Because Governor Herbert neither prepared nor used the talking points, the district court could reasonably decline to rely on them.

PPAU also points to six forms of circumstantial evidence:

1. Governor Herbert's attendance at a pro-life event days after the directive was issued, where Governor Herbert reportedly stated that "I'm here today to add my voice to

10

yours and speak out on the sanctity of life" (Appellant's App'x, vol. 1 at 59-60),

2.  political efforts across the country to defund Planned Parenthood affiliates in reaction to the videos (*Id.* vol. 2 at 399),

3.  Governor Herbert's admission that PPAU was not directly implicated in the Center for Medical Progress videos (*Id.* vol. 1 at 56),

4.  investigative reports debunking allegations that other Planned Parenthood affiliates had engaged in illegal conduct (*Id.* vol. 2 at 398),[6]

5.  Governor Herbert's purported knowledge that the directive would harm Utah citizens (*Id.* at 336-59 (internal communications between officials at the Utah Department of Health)),[7] and

6.  Governor Herbert's statement that he stood by his actions prohibiting Utah from acting as a pass through for federal funds to PPAU (*Id.* at 394, 396).

Based on this circumstantial evidence, PPAU urges an inference that the governor retaliated against PPAU for constitutionally protected

---

[6]  On appeal, PPAU asserts that every governmental agency investigating the videos has exonerated Planned Parenthood. Appellant's Opening Br. at 64. For this assertion, PPAU has relied solely on

- an email transmitting an article from a website called "Media Matters for America" (Appellant's App'x at 387-88) and

- two web articles in the *Huffington Post* (*Id.* at 398-401, 403-04).

[7]  The record also contains evidence that Governor Herbert thought that the directive would not harm Utah citizens. *See* Appellant's App'x, vol. 1 at 55 (Governor Herbert stating that the federal funds would still be used to benefit Utah citizens, as the funds would be "put into the marketplace with other qualified providers").

conduct. But again, the district court could reasonably have relied on Governor Herbert's stated reason for issuing the directive, and this reliance did not constitute an abuse of discretion. Thus, I would uphold the district court's conclusion that PPAU did not show a likelihood of success on the merits of the claims involving unconstitutional conditions.

## IV. Conclusion

I respectfully disagree with the majority's conclusion that PPAU has shown a likelihood of success on the merits of the claims involving unconstitutional conditions. Accordingly, I would affirm the district court's denial of PPAU's motion for a preliminary injunction.