RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0076p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

PLANNED PARENTHOOD OF GREATER OHIO; PLANNED PARENTHOOD OF SOUTHWEST OHIO REGION,

*Plaintiffs-Appellees*,

*v.*

LANCE HIMES, in his official capacity as Interim Director of the Ohio Department of Health,

*Defendant-Appellant*.

No. 16-4027

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:16-cv-00539—Michael R. Barrett, District Judge.

Argued: August 3, 2017

Decided and Filed: April 18, 2018

Before: SILER, CLAY, and WHITE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Eric E. Murphy, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant. Paul R.Q. Wolfson, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Appellees. **ON BRIEF:** Eric E. Murphy, Hannah C. Wilson, Ryan L. Richardson, Zachery P. Keller, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant. Paul R.Q. Wolfson, Kimberly A. Parker, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., Jennifer L. Branch, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, Helene T. Krasnoff, Carrie Y. Flaxman, PLANNED PARENTHOOD FEDERATION OF AMERICA, Washington, D.C., for Appellees. Aaron D. Lindstrom, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, Laura Etlinger, OFFICE OF THE NEW YORK ATTORNEY GENERAL, Albany, New York, Jyotin Hamid, DEBEVOISE & PLIMPTON LLP, New York, New York, for Amici Curiae.

---

**OPINION**

---

HELENE N. WHITE, Circuit Judge.  Enacted in 2016, Ohio Revised Code § 3701.034 requires the Ohio Department of Health (ODH) to ensure that all funds it receives through six non-abortion-related federal health programs are not used to contract with any entity that performs or promotes nontherapeutic abortions, or becomes or continues to be an affiliate of any entity that performs or promotes nontherapeutic abortions.[1]

Plaintiffs Planned Parenthood of Greater Ohio (PPGOH) and Planned Parenthood Southwest Ohio Region (PPSWO) filed this action for declaratory and injunctive relief under 42 U.S.C. § 1983, alleging that § 3701.034 violates 1) their First Amendment rights "by denying state and federal funds" to Plaintiffs "because of–and in retaliation for–their constitutionally protected advocacy for abortion rights and affiliation with other organizations that also advocate for abortion rights and/or provide abortion services"; 2) the Due Process Clause "by denying state and federal funds" to Plaintiffs "because of—and in retaliation for—[Plaintiffs'] own constitutionally protected right to provide abortions and their patients' exercise of the constitutional right to choose to have abortion"; and 3) the Equal Protection Clause "by singling out abortion providers and those who 'promote' abortions, including Plaintiffs, for unfavorable treatment without a constitutionally sufficient justification."  PID 1/Complaint; PID 27-28. Plaintiffs sought to enjoin ODH from enforcing § 3701.034 or terminating Plaintiffs' funding under the six federal programs pursuant to that statute.  PID 309.

The district court entered a temporary restraining order on the day § 3701.034 was to take effect.  PID 308/Dist. Ct. Op. 5/23/16.  Following expedited discovery, Plaintiffs filed motions for judgment on the merits and to permanently enjoin ODH from enforcing § 3701.034, Fed. R. Civ. P. 65(a)(2).  PID 2122-23/Dist. Ct. Op. 8/12/16.  Applying the unconstitutional-conditions

---

[1]The statutory language, quoted *infra* at pp. 3–5, can be read to prohibit the recipient's use of program funds to perform or promote abortion, or to contract or affiliate with organizations that do.  However, ODH has made clear that it reads the provisions as prohibiting ODH from using program funds to contract with organizations that perform or promote abortions or affiliate with entities that do so, even if the funds are used strictly for program purposes, which by definition are unrelated to abortion. *See* PID 883.

doctrine, the district court determined that § 3701.034 impermissibly conditions funding under programs that are unrelated to abortion based on a recipient's foregoing exercise of its First Amendment rights to free speech or association outside the contours of the six programs, and foregoing provision of abortion services protected by the Due Process Clause.[2] *Planned Parenthood of Greater Ohio v. Hodges*, 201 F. Supp. 3d 898 (S.D. Ohio 2016).  The district court granted Plaintiffs' motions for judgment on the merits and a permanent injunction.  *Id.*

ODH appeals, challenging Plaintiffs' standing to assert the due process claims, and arguing that we should not reach Plaintiffs' First Amendment claim because the statute's "conduct provision," which bars funding for entities that perform abortions, does not violate due process.  ODH challenges the district court's ruling on the First Amendment claim as well.  Relying on *Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Department of Health*, 699 F.3d 962 (7th Cir. 2012), *cert. denied*, 569 U.S. 1004 (2013), ODH also challenges the district court's application of the unconstitutional-conditions doctrine to Plaintiffs' due process claim, asserting that in the abortion context, the unconstitutional-conditions doctrine at most bars conditions that impose an undue burden on women's access to abortion, which is not present here.  Because we conclude the district court properly applied the unconstitutional-conditions doctrine and that § 3701.034 is unconstitutional under that doctrine, we AFFIRM.

## I.

### Ohio Revised Code § 3701.034

Ohio Revised Code § 3701.034, which was to take effect on May 23, 2016, provides:

**Prohibition on use of certain funds concerning nontherapeutic abortions**

**(A)** As used in this section:

    (1)  "Affiliate" means an entity that has with another entity a legal relationship created or governed by at least one written instrument that demonstrates any of the following:

---

[2]The district court did not reach Plaintiffs' Equal Protection claim.

(a)  Common ownership, management, or control;

(b)  A franchise agreement;

(c)  The granting or extension of a license or other agreement that authorizes an entity to use the other entity's brand name, trademark, service mark, or other registered identification mark.

(2) "Violence Against Women Act" means section 1910A of section 40151 of the "Violent Crime Control and Law Enforcement Act of 1994," part A of Title XIX of the "Public Health and Human Services Act," 108 Stat. 1920 (1994), former 42 U.S.C. 300w, 42 U.S.C. 280b-1b, as amended.

(3) "Breast and Cervical Cancer Mortality Prevention Act" means the "Breast and Cervical Cancer Mortality Prevention Act of 1990," 104 Stat. 409 (1990), 42 U.S.C. 300k, as amended.

(4) "Infertility prevention project" means the infertility prevention project operated by the United States centers for disease control and prevention.

(5) "Minority HIV/AIDS initiative" means the minority HIV/AIDS initiative operated by the office of minority health in the United States department of health and human services.

(6) "Personal responsibility education program" means the program administered by the administration for children and families in the United States department of health and human services to educate adolescents on abstinence and contraception for the prevention of pregnancy and sexually transmitted infections.

(7) "Nontherapeutic abortion" has the same meaning as in section 9.04 of the Revised Code.[**3**]

(8) "Promote" means to advocate for, assist with, encourage, or popularize through advertising or publicity.[**4**]

**(B) – (G)**[**5**] The department of health shall ensure that all funds it receives through [the Violence Against Women Act, Breast and Cervical Cancer Mortality

---

[**3**]Ohio law defines "nontherapeutic abortion" as "an abortion that is performed or induced when the life of the mother would not be endangered if the fetus were carried to term or when the pregnancy of the mother was not the result of rape or incest reported to a law enforcement agency."  Ohio Rev. Code § 9.04(A)(1).

[**4**]The prohibition on funding entities that "promote" nontherapeutic abortions is found in § 3701.034(B)(2), (C)(2), (D)(2), (E)(2), (F)(2), and (G)(2).

[**5**]Sections (B) through (G), which address each of the programs separately, share identical language in subsections (1) through (4), and are condensed for brevity.

Prevention Act, Infertility prevention project, Minority HIV/AIDS initiative, infant mortality reduction or infant vitality initiatives] are not used to do any of the following:

> (1) Perform nontherapeutic abortions;
>
> (2) Promote nontherapeutic abortions;
>
> (3) Contract with any entity that performs or promotes nontherapeutic abortions;
>
> (4) Become or continue to be an affiliate of any entity that performs or promotes nontherapeutic abortions.

Ohio Rev. Code § 3701.034.

**Plaintiffs**

Plaintiffs PPGOH and PPSWO are not-for-profit corporations organized under Ohio law. PID 84, 126; PPSWO President & CEO Jerry Lawson Decl., PPGOH President & CEO, Iris Harvey Decl. PPGOH and PPSWO are independent entities; however, both are affiliates of Planned Parenthood Federation of America, Inc. (PPFA), which advocates for women's access to comprehensive reproductive healthcare, including abortion. PID 86, Harvey Decl.; 2123/Dist. Ct. Op. 8/12/16. Plaintiffs now operate twenty-seven[6] health centers throughout Ohio, which are staffed with physicians, nurse practitioners, and physician assistants, who provide well-woman exams, testing and treatment for sexually transmitted diseases, screenings for breast and cervical cancer and HIV, and contraception and contraceptive counseling. Three of the twenty-seven health centers also provide abortion services. PID 86/Harvey Decl.; 126, 127/Lawson Decl. Separate from their government-funded health services and education programs, PPGOH and PPSWO advocate for a woman's right to safe and lawful abortion through public awareness campaigns and public education activities. PID 86, 127-28.

No government funds are used to pay for or subsidize Plaintiffs' abortion services or advocacy; Plaintiffs operate within the confines of federal and Ohio law, which for decades have prohibited the use of public funds to pay for abortions. PID 87/Harvey Decl.; PID 128-29/Lawson Decl; *see also infra* n.8. It is undisputed that Plaintiffs "maintain measures to ensure

---

[6]During the pendency of this appeal, Plaintiffs' counsel advised that one of the twenty-eight health centers has closed for reasons unrelated to this case. The district court's opinion states that Plaintiffs operate twenty-eight health centers; that number was accurate at the time.

that none of the funds received from the state or federal government are used, directly or indirectly, to subsidize the promotion of abortion or performance of abortion services." PID 2136/Dist. Ct. Op. 8/12/16.

Largely through competitive grant processes, Plaintiffs have for years received funds (and material assistance) distributed by ODH and county health departments under the six federal programs impacted by § 3701.034: the Infertility prevention project, Breast and Cervical Cancer Mortality Prevention Act, Violence Against Women Act, Minority HIV/AIDS initiative, STD Prevention Program, and Personal Responsibility Education Program (PREP).[7]

Throughout those years, Plaintiffs passed all state and local audits and program reviews. After § 3701.034 was enacted, however, ODH and local health departments notified Plaintiffs that their contracts under the six federal programs would be terminated and they would not be eligible for funding. PID 883-908/ODH letters to ODH subcontractors and Plaintiffs, and letters from local agencies/subcontractors to Plaintiffs advising of termination of contracts; PID 2124/Dist. Ct. Op. 8/12/16.

## Standard of Review

This court reviews a challenge to the constitutionality of a statute de novo. *Entm't Prods., Inc. v. Shelby Cty., Tenn.*, 721 F.3d 729, 733 (6th Cir. 2013). The district court's factual findings are reviewed for clear error, its legal conclusions are reviewed de novo, and the scope of injunctive relief is reviewed for abuse of discretion. *Sec'y of Labor, U.S. Dep't of Labor v. 3Re.com, Inc.*, 317 F.3d 534, 537 (6th Cir. 2003). "A party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer continuing irreparable injury for which there is no adequate remedy at law." *Lee v. City of Columbus, Ohio*, 636 F.3d 245, 249 (6th Cir. 2011) (quoting *Wedgewood Ltd. P'ship I v. Twp. of Liberty, Ohio*, 610 F.3d 340, 349 (6th Cir. 2010)). "Injunctive relief involving matters subject to state regulation may be

---

[7]Plaintiffs' counsel advised the court by letter dated July 27, 2017, that PPGOH did not reapply for grant funding under the PREP program when its contract expired on July 31, 2017, and that it appears that ODH will no longer be responsible for allocating PREP funds as of August 1, 2017; thus "there is a question as to whether [this court] need consider PREP in its analysis of Section 3701.034."

no broader than necessary to remedy the constitutional violation." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1069 (6th Cir. 1998).

## II.

We first address ODH's standing argument. ODH asserts that the district court erroneously transformed a woman's abortion right into a provider's right by treating Plaintiffs as if they hold an independent due process abortion right. Challenging the district court's reliance on *Singleton v. Wulff*, 428 U.S. 106 (1976), ODH asserts that the doctrine of third-party standing permits a party to assert the rights of another only if the party shows that the missing party's rights have been violated; and because abortion providers lack any abortion right of their own, no burden on them could ever amount to an unconstitutional burden without a *separate* showing of an unconstitutional effect on women. Appellant Br. 42–44. According to ODH, "That abortion providers must rely on the rights of women confirms that they do not hold the constitutional rights here." Appellant Br. 44.

ODH does not grapple with precedent, which clearly holds that abortion providers have standing to enforce their patients' abortion rights. *See* PID 2138; *Singleton v. Wulff*, 428 U.S. 106, 118 (1976) ("[I]t generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision."); *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 62 (1976) (physicians who supervised abortions at Planned Parenthood had standing to challenge constitutionality of Missouri statute); *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1396 (6th Cir. 1987) (holding that Planned Parenthood and its Medical Director had standing to assert third-party rights (of women) as well as their own rights); *see also Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1260 (10th Cir. 2016) ("[B]ecause abortion is a medical procedure, . . . the full vindication of the woman's fundamental right necessarily requires that her" medical provider be afforded the right to "'make his best medical judgment,'" which includes "implementing [the woman's decision] should she choose to have an abortion.") (quoting *City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 427 (1983), *overruled in part on other grounds* in *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 870 (1992)); *Planned Parenthood of Wis. v. Doyle*, 162 F.3d 463, 465 (7th Cir. 1998) ("The standing of the physician

plaintiffs, and of Planned Parenthood as the owner of abortion clinics in Wisconsin, to maintain this suit is not open to question."). ODH cites no case holding that an abortion provider lacks standing to challenge a law concerning abortion.

ODH's remaining arguments go to the merits and are addressed below.

**III.**

ODH asserts that the "conduct provision" of § 3701.034 (precluding entities that *perform* abortions from obtaining funding under six federal programs) comports with due process under *Maher v. Roe*, 432 U.S. 464 (1977), *Harris v. McRae*, 448 U.S. 297 (1980), and *Rust v. Sullivan*, 500 U.S. 173 (1991), and argues that we should decide the case on this basis alone, without reaching the First Amendment claim because any ruling on that claim would be an improper advisory opinion in violation of the doctrine of constitutional avoidance.

We need not address ODH's constitutional-avoidance argument because we conclude that § 3701.034 violates Plaintiffs' due process rights by imposing unconstitutional conditions.

**A.**

The Supreme Court remarked decades ago that the unconstitutional-conditions doctrine is well-established:

> For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. *It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.* For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which (it) could not command directly.' *Speiser v. Randall*, 357 U.S. 513, 526 [(1958)]. Such interference with constitutional rights is impermissible.

*Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (emphasis added); *see also Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 612 (2013) ("A predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person

asserting the claim to do what it attempted to pressure that person into doing.") (citing *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 59–60 (2006)).

More recently, in *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l*, 570 U.S. 205 (2013) (hereafter *AOSI*), the Supreme Court invalidated a statutory provision requiring organizations receiving program funds to have a policy explicitly opposing prostitution and sex trafficking, finding the provision imposed an unconstitutional condition by requiring that a recipient affirm "a belief that by its nature cannot be confined within the scope of the Government program." *AOSI*, 570 U.S. at 221. Chief Justice Roberts wrote for the Court:

> The United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 . . . outlined a comprehensive strategy to combat the spread of HIV/AIDS around the world. As part of that strategy, Congress authorized the appropriation of billions of dollars to fund efforts by nongovernmental organizations to assist in the fight. The Act imposes two related conditions on that funding: First, no funds made available by the Act "may be used to promote or advocate the legalization or practice of prostitution or sex trafficking." [28 U.S.C.] § 7631(e). And second, no funds may be used by an organization "that does not have a policy explicitly opposing prostitution and sex trafficking." 7631(f). This case concerns the second of these conditions, referred to as the Policy Requirement. The question is whether that funding condition violates a recipient's First Amendment rights.
>
> . . . .
>
> By demanding that funding recipients adopt—as their own—the Government's view on an issue of public concern, the condition by its very nature affects "protected conduct outside the scope of the federally funded program." *Rust*, 500 U.S., at 197. A recipient cannot avow the belief dictated by the Policy Requirement when spending Leadership Act funds, and then turn around and assert a contrary belief, or claim neutrality, when participating in activities on its own time and dime. By requiring recipients to profess a specific belief, the Policy Requirement goes beyond defining the limits of the federally funded program to defining the recipient. *See ibid.* ("our 'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program").

*AOSI*, 570 U.S. at 208, 218–19. *AOSI* thus reiterated that the government may not require the surrender of constitutional rights as a condition of participating in an *unrelated* government program. *Id.* at 214; *see also Rust*, 500 U.S. at 197.

The unconstitutional-conditions doctrine is not limited to First Amendment rights, but rather, applies in a number of contexts, *Koontz*, 570 U.S. at 604 ("We have said in a variety of contexts that 'the government may not deny a benefit to a person because he exercises a constitutional right.'") (citation omitted), including, as this court has recognized, to vindicate "due process rights," *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 434 (6th Cir. 2005) ("Under the unconstitutional conditions doctrine, 'a state actor cannot constitutionally condition the receipt of a benefit, such as a liquor license or an entertainment permit, on an agreement to refrain from exercising one's constitutional rights.'") (quoting *G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1077 (6th Cir. 1994)).

**B.**

ODH characterizes Plaintiffs' claims as resting on an asserted entitlement to government funding. *See* Appellant Br. 2, 5 ("Ohio decided to favor childbirth over abortion when it distributes public funds for six health and education programs. Unhappy with Ohio's choice, Planned Parenthood seeks a different allocation . . . . It seeks a *constitutional guarantee* to public funding—a guarantee that forces Ohio, against its own judgment, to give public money to large abortion providers. The Constitution contains no such guarantee.")

ODH mischaracterizes Plaintiffs' argument. Plaintiffs do not claim an entitlement to government funds. They acknowledge the government's right to define the parameters of its own programs, and have complied with all program requirements. What they do claim is a right not to be penalized in the administration of government programs based on protected activity outside the programs. As the district court noted, § 3701.034 is unnecessary to accomplish Ohio's choices to favor childbirth and refrain from subsidizing abortions; the program funds here have nothing to do with abortion and for decades both federal and Ohio law[8] have prohibited the use of government funds to pay for abortions. PID 2139-42.

---

[8]*See McRae*, 448 U.S. at 302 ("Since September 1976, Congress has prohibited—either by an amendment to the annual appropriations bill for the Department of Health, Education, and Welfare or by a joint resolution—the use of any federal funds to reimburse the cost of abortions under the Medicaid program except under certain specified circumstances. This funding restriction is commonly known as the 'Hyde Amendment,' after its original congressional sponsor, Representative Hyde.") (footnote omitted); Ohio Rev.Code § 9.04, titled "State funding for nontherapeutic abortion coverage prohibited."

*Maher*, *McRae*, and *Rust* hold that the government may constitutionally make policy and value judgments in allocating public funds under government programs, and is not required to subsidize abortion by including coverage for abortion in public-benefits programs.  *Maher*, 432 U.S. at 470–71, 474 (rejecting challenge to Connecticut Welfare Department regulation limiting state Medicaid benefits for first-trimester abortions to those that are medically necessary); *McRae*, 448 U.S. at 322–23 (rejecting challenge to Medicaid Act's Hyde Amendment's limitation of funding to those abortions necessary to save life of mother, while permitting funding of costs associated with childbirth.); *Rust*, 500 U.S. at 192–94 (rejecting challenge to regulations providing funding for family-planning services but prohibiting funds for abortion counseling and referral).  The Constitution does not require that the government fund all family-planning activities equally.  *See Rust*, 500 U.S. at 194.  Further, the failure to subsidize the exercise of a constitutional right does not abridge the right.  *See Maher*, 432 U.S. at 474; *McRae*, 448 U.S. at 316–17; *Rust*, 500 U.S. at 193.

None of these principles are implicated here.  The issue in the instant challenge is different:  whether Ohio may require a provider to surrender the right to provide safe and lawful abortions on its own "time and dime" as a condition of participating in government programs that have nothing to do with abortion.

*McRae* and *Maher* do not suggest that such a requirement is constitutional.  In fact, *McRae* acknowledged that a "substantial constitutional question would arise if Congress had attempted to withhold all Medicaid benefits from an otherwise eligible candidate simply because that candidate had exercised her constitutionally protected freedom to terminate her pregnancy by abortion."  448 U.S. at 317 n.19.

And *Rust* makes clear that the *Maher* line of cases is inapposite here.  In *Rust*, the Supreme Court addressed regulations implementing Title X of the Public Health Services Act, 42 U.S.C. §§ 300–300a-6, which "provides federal funding for family-planning services," and authorizes the Secretary of the Department of Health and Human Services to "make grants and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services."  500 U.S. at 178 (quoting 42 U.S.C. § 300(a)).

The challenged regulations prohibited use of Title X funds "in programs where abortion is a method of family planning." *Id*. The plaintiffs, Title X grantees and doctors who supervise Title X funds, attacked the facial validity of the regulations and sought declaratory and injunctive relief on behalf of themselves and their patients. The Second Circuit "upheld the regulations, finding them to be a permissible construction of the statute as well as consistent with the First and Fifth Amendments to the Constitution." *Id*.

In addressing the petitioners' First Amendment challenge to the regulations on the basis that they impermissibly discriminated based on viewpoint by prohibiting "all discussion about abortion as a lawful option—including counseling, referral, and the provision of neutral and accurate information about ending a pregnancy—while compelling the clinic or counselor to provide information that promotes continuing a pregnancy to term," the *Rust* Court observed:

> There is no question but that the statutory prohibition contained in § 1008 is constitutional. In *Maher v. Roe*, 432 U.S. 464 [] (1977), we upheld a state welfare regulation under which Medicaid recipients received payments for services related to childbirth, but not for nontherapeutic abortions. The Court rejected the claim that this unequal subsidization worked a violation of the Constitution. We held that the government may "make a value judgment favoring childbirth over abortion, and . . . implement that judgment by the allocation of public funds." *Id.*, 432 U.S., at 474 []. Here the Government is exercising the authority it possesses under *Maher* and *Harris v. McRae*, 448 U.S. 297 [] (1980), to subsidize family planning services which will lead to conception and childbirth, and declining to "promote or encourage abortion." The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other. "[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." *Regan* [*v. Taxation with Representation of Wash.*,] 461 U.S. [540], 549 [1983] . . . . "There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." *Maher*, *supra*, 432 U.S., at 475 [].
>
> . . . .
>
> Petitioners' assertions ultimately boil down to the position that if the government chooses to subsidize one protected right, it must subsidize analogous counterpart rights. But the Court has soundly rejected that proposition. *Regan v. Taxation with Representation of Wash.*, *supra*; *Maher v. Roe*, *supra*; *Harris v. McRae*,

> *supra*.  Within far broader limits than petitioners are willing to concede, when the Government appropriates public funds to establish a program it is entitled to define the limits of that program.

*Rust*, 500 U.S. at 192–94.  *Rust* thus simply reiterated that the government is not required to subsidize the provision or promotion of abortion, even when it chooses to fund other family-planning programs and services.  Critically, the regulations at issue in *Rust*, unlike § 3701.034, were directly related to the use of the program funds:  Title X family-planning funds could not be used to fund family-planning programs where abortion is a method of family planning.  Here, the statute restricts funds in programs that are completely unrelated to family planning or abortion.  Further, the regulations challenged in *Rust*, unlike the statute here, did not penalize abortion providers for activities outside the federally funded family-planning program.

Rust itself observed, "our 'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program."  *Id.* at 197 (emphasis in original).  Unlike in *Rust*, that is precisely what § 3701.034 does.

Further, in rejecting the petitioners' reliance on the unconstitutional-conditions doctrine, the *Rust* Court distinguished the *Rust* petitioners' situation from alternative scenarios similar to the one presented here:

> Petitioners also contend that the restrictions on the subsidization of abortion-related speech contained in the regulations are impermissible because they condition the receipt of a benefit, in these cases Title X funding, on the relinquishment of a constitutional right, the right to engage in abortion advocacy and counseling.  Relying on *Perry v. Sindermann*, 408 U.S. 593, 597 [] (1972), and *FCC v. League of Women Voters of Cal.*, 468 U.S. 364 [] (1984), petitioners argue that "even though the government may deny [a] . . . benefit for any number of reasons, there are some reasons upon which the government may not rely.  It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."  *Perry, supra*, 408 U.S., at 597 [].
>
> Petitioners' reliance on these cases is unavailing, however, because here the Government is not denying a benefit to anyone, but instead simply insisting that public funds be spent for the purposes for which they were authorized.  The Secretary's regulations do not force the Title X grantee to give up abortion-related

> speech; they merely require that the grantee keep such activities separate and distinct from Title X activities. Title X expressly distinguishes between a Title X *grantee* and a Title X *project*. The grantee, which normally is a health-care organization, may receive funds from a variety of sources for a variety of purposes. The grantee receives Title X funds, however, for the specific and limited purpose of establishing and operating a Title X project. 42 U.S.C § 300(a). The regulations govern the scope of the Title X *project's* activities, and leave the grantee unfettered in its other activities. The Title X *grantee* can continue to perform abortions, provide abortion-related services, and engage in abortion advocacy; it simply is required to conduct those activities through programs that are separate and independent from the project that receives Title X funds. 42 CFR § 59.9 (1989).

*Id.* at 196–97 (emphasis in original). In contrast, the statute here does not distinguish between the grantee and the project; it does not permit the grantee to keep the abortion-related speech and activities separate from governmental programs; it does not leave the grantee unfettered in its other activities; and it does not permit the grantee to "continue to perform abortions, provide abortion-related services, and engage in abortion advocacy . . . through programs that are separate and independent from the project[s] that receive[] the [six program funds]." *Rust*, 500 U.S. at 197.

Thus, we do not agree with ODH that § 3701.034 "comports with due process" under *Maher*, *McRae*, and *Rust*.

## C.

We turn to ODH's argument, rejected by the district court, that the unconstitutional-conditions doctrine, at most, bars unconstitutional conditions only when they actually operate to impose an undue burden. ODH relies on the Seventh Circuit's divided decision in *Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Department of Health*, 699 F.3d 962 (7th Cir. 2012), *cert. denied*, 569 U.S. 1004 (2013) (hereafter *PPI*).[9] Appellant Br. 36–37, 47-48; Reply Br. 4, 14. There, PPI, a Medicaid provider that performs abortions, and two low-

---

[9]The State of Indiana petitioned for certiorari, arguing that the Court should address the important national issue whether states may preclude abortion providers from receiving Medicaid subsidies. No. 11-2464, 2011 WL 3274237. Planned Parenthood then filed a conditional cross-petition for certiorari, requesting that if the Court grants Indiana's petition, it also grant review of the Seventh Circuit's unconstitutional-conditions holding. Conditional Cross-Petition for Certiorari filed in No. 12-1559, 2013 WL 1191187. The Supreme Court denied certiorari.

income patients who used its services, brought suit under 42 U.S.C. § 1983, challenging the constitutionality of an Indiana law that prohibited state agencies from contracting with or making grants to any entity that performs abortions. The district court did not rule on PPI's unconstitutional-conditions claim, but the Seventh Circuit panel majority addressed it, observing that the government need not be neutral between abortion providers and other medical providers, particularly regarding the use of public funds, and that as long as the difference in treatment does not unduly burden a woman's right to obtain an abortion, the government is free to treat abortion providers differently from other medical providers:

> The first step in any unconstitutional-conditions claim is to identify the nature and scope of the constitutional right arguably imperiled by the denial of a public benefit. . . . Here, Planned Parenthood's unconstitutional-conditions claim necessarily derives from a woman's constitutional right to obtain an abortion. *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 [] (1992) ("Constitutional protection of the woman's decision to terminate her pregnancy derives from the Due Process Clause of the Fourteenth Amendment." (emphasis added)). Under existing precedent any protection for Planned Parenthood as an abortion provider is "derivative of the woman's position." *Id.* at 884 [] (plurality opinion).
>
> Two aspects of the Supreme Court's abortion jurisprudence are important here. First, the Court has explained that the constitutional right to obtain an abortion is a right against coercive governmental burdens; the government may not "prohibit any woman from making the ultimate decision to terminate her pregnancy" before fetal viability or impose an "undue burden on a woman's ability to make this decision." *Id.* at 874, 879 []; *see also Gonzales v. Carhart*, 550 U.S. 124, 146 [] (2007). An "undue burden" exists if the challenged law has the "purpose or effect" of placing "a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Casey*, 505 U.S. at 878 [] (plurality opinion); *see also Gonzales*, 550 U.S. at 146 [].
>
> Accordingly, the Court has conceptualized the right as "a constitutionally protected interest 'in making certain kinds of important decisions' free from governmental compulsion." *Maher v. Roe*, 432 U.S. 464, 473 (1977) (quoting *Whalen v. Roe*, 429 U.S. 589, 599–600 & nn. 24 & 26 [] (1977)).
>
> This brings up the second important point. The Court has explicitly rejected a neutrality-based view of abortion rights. Thus, the Court has held that although the abortion right recognized in *Roe v. Wade* "protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy[,] [i]t implies no limitation on the authority of a State to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds." *Id.* at 473–74 []. In *Maher* the Court upheld

Connecticut's ban on public funding for non-therapeutic abortions because it "places no obstacles—absolute or otherwise—in the pregnant woman's path to an abortion." *Id.* at 474 []. The Court reaffirmed *Maher* in *Harris v. McRae*, 448 U.S. 297, 314–17 [] (1980), upholding the Hyde Amendment. And in *Webster v. Reproductive Health Services*, 492 U.S. 490, 508–11 [] (1989), the Court upheld Missouri's statutory ban on the use of public employees and facilities to perform or assist in the performance of an abortion.

Finally, in *Rust v. Sullivan*, 500 U.S. 173 [] (1991), the Court rejected a challenge to federal regulations prohibiting recipients of Title X family-planning grants from advocating abortion as a method of family planning or referring patients for abortion. Under the regulations, grant recipients with abortion-related practices could continue to receive Title X money only if they segregated their abortion-related activities in a separate affiliate. *Id.* at 179–81 []. *Rust* held that the regulations did not place an unconstitutional condition on Title X grant recipients. *Id.* at 203. This was so whether the claim was premised on the speech rights of the providers, *id.* at 196–99 [], or the abortion rights of their patients, *id.* at 201–03 []. As relevant here, the Court reaffirmed the holdings of *Webster*, *Harris*, and *Maher* that "[t]he Government has no constitutional duty to subsidize an activity merely because the activity is constitutionally protected and may validly choose to fund childbirth over abortion." *Id.* at 201. Because the Title X regulations did not place an undue burden on a woman's right to obtain an abortion or otherwise impose an unconstitutional condition on grant recipients, the Court upheld the regulatory scheme. *Id.* at 203 [].

As these cases make clear, the government need not be neutral between abortion providers and other medical providers, and this principle is particularly well-established in the context of governmental decisions regarding the use of public funds. As long as the difference in treatment does not unduly burden a woman's right to obtain an abortion, the government is free to treat abortion providers differently.

Applying these principles here, the unconstitutional-conditions claim is not likely to succeed. Planned Parenthood does not argue that the loss of its block-grant funding imposes an undue burden—directly or indirectly—on a woman's right to obtain an abortion. If, as the foregoing cases hold, the government's refusal to subsidize abortion does not unduly burden a woman's right to obtain an abortion, then Indiana's ban on public funding of abortion providers—even for unrelated services—cannot *indirectly* burden a woman's right to obtain an abortion.

*PPI*, 699 F.3d at 986–88 (emphasis in original).[10]

---

[10]Judge Cudahy dissented in part, concluding that the record was insufficiently developed to permit consideration of the state's restrictions on block-grant funding (Medicaid funding was also at issue) and that "the issue of unconstitutional conditions should be remanded to the district court for development of the record with respect to any possible imposition of a burden on access to abortions." 699 F.3d at 988–89.

We are not persuaded by the Seventh Circuit's reasoning or ODH's arguments. The Seventh Circuit did not directly address the unconstitutional-conditions argument. It identified the right at issue as a woman's right to obtain an abortion free of the government's imposition of an undue burden; noted that the cases make clear that the government is not required to remain neutral on abortion and has no obligation to fund abortion or abortion advocacy, even when funding other family-planning activity; noted that there was no claim or showing that the loss of the block-grant money imposed an undue burden on a woman's right to obtain an abortion; and concluded without further explanation that if "the government's refusal to subsidize abortion does not unduly burden a woman's right to an abortion, then Indiana's ban on public funding of abortion providers—even for unrelated services—cannot *indirectly* burden a woman's right to obtain an abortion." *PPI*, 699 F.3d at 988 (emphasis in original). This analysis completely elides the unconstitutional-conditions argument by concluding, in effect, that because Ohio has the right to refuse to fund abortion, it necessarily has the right to refuse to provide any funds to abortion providers, regardless of how the funds are to be used; and this right is subject only to the requirement that it not unduly burden a woman's right to obtain an abortion, which the challenged provision did not.

In discussing *Rust*, the *PPI* court appeared to recognize that the undue burden and unconstitutional-conditions doctrines are different—"[b]ecause the Title X regulations did not place an undue burden on a woman's right to obtain an abortion *or* otherwise impose an unconstitutional condition on grant recipients, the Court upheld the regulatory scheme," *id*. at 988 (emphasis added)—but then went on to ignore the latter. Its analysis does not grapple with the argument that although the government may constitutionally place conditions on the use of program funds, favoring one public policy over others even in the face of a constitutional right to pursue the disfavored policy, the government may not constitutionally exclude a recipient from funding based on the recipient's exercise of constitutional rights outside the parameters of the program that have no bearing on or nexus to the program. *PPI* fails to acknowledge that if the government cannot directly prohibit Plaintiffs from providing and advocating for abortion on their own time and dime, it may not do so by excluding them from government programs for which they otherwise qualify and which have nothing to do with the government's choice to disfavor abortion.

We note that *PPI* was decided before *AOSI*, which may account for the failure to give due consideration to the unconstitutional-conditions doctrine.  Other courts have applied the unconstitutional-conditions doctrine in similar circumstances without engaging in an undue-burden analysis.  In *Planned Parenthood Ass'n of Utah v. Herbert* , 828 F.3d 1245 (10th Cir. 2016) (hereafter *PPAU*), Utah's governor, one of the defendants, issued a directive instructing state agencies to cease acting as intermediaries for pass-through federal funds to Planned Parenthood for four federal programs unrelated to abortion.  828 F.3d at 1250.  The directive was issued in response to videos released by an organization purportedly showing Planned Parenthood staff discussing its fetal-tissue donation program.  PPAU sought declaratory and injunctive relief under 42 U.S.C. § 1983, alleging violations of its Equal Protection, First Amendment, and Due Process rights, the latter two under the unconstitutional-conditions doctrine.  *Id*. at 1258.  PPAU's motion for preliminary injunction argued that its "association with other Planned Parenthood providers who participate in lawful programs that allow abortion patients to donate fetal tissue for scientific research . . . is protected under the First Amendment," and that the governor's directive violated its rights and its patients' due process rights "to provide and access abortion services by imposing a penalty on PPAU for the provision of and/or association with abortion services without adequate justification." *Id*. at 1251.  The district court denied the motion for temporary restraining order and PPAU sought interlocutory review.

The Tenth Circuit reversed on the First Amendment and Due Process claims and remanded for entry of a temporary restraining order in PPAU's favor, observing:

> PPAU's unconstitutional conditions claims . . . . alleged . . . that Herbert took a discretionary executive action, i.e., issuing the Directive, that terminated PPAU's contractual relationships with [the Executive Director of the Utah Department of Health] and was motivated by PPAU's engagement in the following activities: "associat[ing] with other Planned Parenthood providers who participate in lawful programs that allow abortion patients to donate fetal tissue for scientific research," Dist. Ct. Docket No. 3 at 3; advocating for legal abortions, App. at 475; associating with organizations for political, social and education reasons, *id*. at 476; and providing abortion services to its patients.
>
> . . . .
>
> PPAU has also alleged in Count 3, without serious challenge from defendants, a Fourteenth Amendment right.  The Supreme Court has recognized that "the Fourteenth Amendment's concept of personal liberty and restrictions upon state

action . . . encompass[es] a woman's decision whether or not to terminate her pregnancy." *Roe v. Wade*, 410 U.S. 113, 153 (1973). The Court has also recognized that, "because abortion is a medical procedure, . . . the full vindication of the woman's fundamental right necessarily requires that her" medical provider be afforded the right to "'make his best medical judgment,'" which includes "implementing [the woman's decision] should she choose to have an abortion." *City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 427 [] (1983) (quoting *Doe v. Bolton*, 410 U.S. 179, 192 [] (1973)), *overruled on other grounds by Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 [] (1992). . . .

Having determined that PPAU has identified valid First and Fourteenth Amendment rights, that leaves the question of whether PPAU can establish that Herbert issued the Directive in retaliation for PPAU's exercise of those rights. The district court concluded that PPAU failed to establish a likelihood of success on this point . . . .

. . . . [disagreeing with district court's determination that PPAU did not establish that the governor's opposition to abortion was a substantial or motivating factor for the directive/termination of contracts]

. . . .

Considering all of th[e] evidence together, we conclude that a reasonable finder of fact is more likely than not to find that Herbert issued the Directive to punish PPAU for the First and Fourteenth Amendment rights it has identified in this litigation . . . .

. . . .

In summary, we conclude that PPAU has established a substantial likelihood of success on the merits of its unconstitutional conditions claims and that the district court erred in concluding otherwise.

*PPAU*, 828 F.3d at 1259–63. The *PPAU* court did not find it necessary to ask whether the Governor's directive would unduly burden the availability of abortion services in Utah. It was enough that the directive likely[11] amounted to an unconstitutional penalty for PPAU's abortion-related conduct and association.

In *Planned Parenthood of Southwest & Central Florida v. Philip*, 194 F. Supp. 3d 1213 (N.D. Fla. 2016) (hereafter *PPSCF*), the district court rejected the argument of the defendants, Florida's State Surgeon General and Secretary of Health Care Administration, that the only restriction the Constitution places on abortion legislation is that the state cannot impose an undue

---

[11]Because the court was reviewing the denial of a preliminary injunction, it evaluated the likelihood of success on the merits.

burden on a woman's right to an abortion. 194 F. Supp. 3d at 1220. PPSCF and other affiliates challenged a newly enacted "defunding provision," Fla. Stat. § 390.0111(15), which provided, as pertinent here, that a state agency or local government entity "may not expend funds for the benefit of, pay funds to, or initiate or renew a contract with an organization that owns, operates, or is affiliated with one or more clinics that are licensed under this chapter and perform abortions." 194 F. Supp. 3d at 1215. The district court granted the plaintiffs' motion for preliminary injunction, observing:

> Under the defunding provision, as a condition of receiving state or local funds for unrelated services, the plaintiffs must stop providing abortions that women are constitutionally entitled to obtain. But as the defendants acknowledged at oral argument, the state could not constitutionally prohibit the plaintiffs from providing these abortions. The Supreme Court has repeatedly said that a government cannot prohibit indirectly—by withholding otherwise-available public funds—conduct that the government could not constitutionally prohibit directly.
>
> . . . .
>
> Here . . . the constitutional right at issue—or, at least, the primary constitutional right at issue—belongs to the plaintiffs' *patients*. A patient has a right to an abortion, within limits. *See, e.g., Whole Woman's Health v. Hellerstedt*, No. 15–274, —— U.S. ——, 136 S. Ct. 2292, 195 L. Ed. 2d 665 (U.S. June 27, 2016); *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 [] (1982); *Roe v. Wade*, 410 U.S. 113 [] (1973). The plaintiffs have a right to provide abortions, but the right is derivative of the patients' rights.
>
> . . . .
>
> If, as the Court said in *Rust*, Congress can prohibit the use of federal funds for abortion services but cannot restrict a recipient of federal funds from separately providing abortion services, then the Florida legislature likewise can prohibit the use of state funds for abortion services but cannot prohibit a recipient of state funds from separately providing abortion services. *Rust* is fatal to the defunding provision, which was enacted precisely and only for a prohibited purpose: to reach other, unrelated activities that are separate from the recipient's abortion services. That this was the only purpose of the defunding provision is clear because Florida law already prohibited the use of state funds for abortions.

*PPSCF*, 194 F. Supp. 3d at 1216–19. Similar to ODH's argument here, the Florida defendants argued that the unconstitutional-conditions doctrine does not apply in the abortion context and that the statute was limited only by *Casey*'s requirement that the state cannot impose an undue burden on women's right to an abortion. The *PPSCF* court rejected that argument:

> The defendants' assertion that the unconstitutional-conditions doctrine does not apply in this context is incorrect. Nothing in *Whole Woman's Health* or *Casey* suggests in any way that those decisions were intended to supplant the wholly separate unconstitutional-conditions doctrine. And *Rust*'s analysis is squarely to the contrary.

*PPSCF*, 194 F. Supp. 3d at 1220.[12]  We agree.

Finally, in *Planned Parenthood of Central North Carolina v. Cansler*, 877 F. Supp. 2d 310 (M.D. N.C. 2015) (hereafter *PPCNC*), PPCNC alleged that a North Carolina statute violated its rights under the Due Process Clause by denying non-abortion related funding based on its activity as an abortion-rights advocate and abortion provider.  877 F. Supp. 2d at 314–15.  The district court granted PPCNC's motion for summary judgment and a permanent injunction, concluding that the provision violated PPCNC's due process (and First Amendment) rights because only PPCNC and its affiliates were excluded and, since there was no evidence that it would have used government funds for abortion-related services, the provision limited access to government funding in a manner that impeded the organization's constitutional rights and was not necessary to serve a compelling government interest.  *Id*. at 318–21.  The *PPCNC* court stated:

> [I]t is undisputed that only Planned Parenthood and its affiliates are excluded from DHHS-administered contracts and grants under Section 10.19.  It is also undisputed that Planned Parenthood is an entity that would be otherwise eligible to receive funding, but for Section 10.19.  Moreover, although Defendant contends that Section 10.19 operates merely as an exercise of discretion with regard to funding decisions, based on the State's objective in favoring childbirth over abortion, it is undisputed that the government funding at issue in this case would not be used to fund abortion-related services or advocacy.  In that regard, the Court notes that Defendant has provided no evidence that the funding prohibition in Section 10.19 is necessary to ensure that government funds are not used for abortion-related services, as both federal and North Carolina legislation already exist to bar government funds from being used for abortion-related services.  Furthermore, Defendant has presented no evidence or even allegation that Plaintiff would use, or has ever used, government funds for abortion-related services.  Rather, "there is no dispute that Section 10.19 prohibits Planned Parenthood and its affiliated organizations, including PPCNC, from receiving funding for non-abortion-related projects based on their other activities for which

---

[12]No appeal was taken in *PPSCF*.

they have not sought funding." (Prelim. Inj. Order, 804 F. Supp. 2d at 493). Therefore, based on the evidence before the Court, and the line of precedent described herein, the Court finds that Section 10.19 limits access to government funding for Plaintiff, as a recipient, in a manner that impedes Plaintiff's constitutional rights, and which is not necessary to serve a compelling government interest. [*Planned Parenthood of Mid-Mo. & E. Kan., Inc. v.*] *Dempsey*, 167 F.3d [458,] 461 [(8th Cir. 1999)] ("[F]unding classifications that interfere with the exercise of constitutional rights must be necessary to promote a compelling interest." (internal quotations and citations omitted)).

*PPCNC*, 877 F. Supp. 2d at 320–21 (most internal citations to record omitted).[13] The same is true here.

We reject the Seventh Circuit's analysis in *PPI* in favor of the reasoning in these cases, which parallels our own.

In sum, as reaffirmed in *AOSI*, which was decided after *PPI*, although the government has no obligation to subsidize constitutionally protected activity, it may not use its control over funds to curtail the exercise of constitutionally protected rights outside the scope of a government-funded program. In the instant case, § 3701.034 imposes conditions on funding under the six non-abortion related federal programs and the unconstitutional-conditions doctrine is thus applicable. We do not find *PPI* persuasive; as the district court determined, its importation of *Casey*'s undue-burden analysis is questionable. *See PPSCF*, 194 F. Supp. 3d at 1213. Neither *Casey*, 505 U.S. 833, nor *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), discussed *infra*, suggests that the undue-burden analysis was intended to replace the unconstitutional-conditions doctrine.

**IV.**

Even accepting ODH's assertion that in the "abortion" context we must engage in an undue-burden analysis, Plaintiffs established that § 3701.034 is unnecessary to advance the interests ODH asserts.

Several years after the Seventh Circuit issued *PPI*, the Supreme Court clarified the undue-burden standard in *Whole Woman's Health*, 136 S. Ct. 2292, as revised (June 27, 2016),

---

[13]No appeal was taken in *PPCNC*.

explaining that "[t]he [undue-burden] rule announced in *Casey* . . . requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Whole Woman's Health*, 136 S. Ct. at 2309–10[14] (citing *Casey*, 505 U.S. at 887–898) [] (opinion of the Court) (performing this balancing with respect to a spousal notification provision); *id.*, at 899–901 [] (joint opinion of O'Connor, Kennedy, and Souter, JJ.) (same balancing with respect to a parental notification provision)).

## A.

ODH asserts that the "conduct provision," which bars funding for entities that perform abortions, furthers the following important state interests:  1) the interest in promoting life, 2) "prevent[ing] entanglement between program services and abortion services–ensuring that taxpayer dollars do not subsidize abortion," 3) serving "administrative considerations" by ensuring that taxpayer funds do not directly or indirectly subsidize abortion ("it is much easier for the government simply to preclude abortion providers from participating in the programs than to allow their participation subject to costly oversight and audits"), and 4) "help[ing] Ohio convey its childbirth preference" "[b]y separating abortion providers from these programs, the Conduct Provision clarifies Ohio's message."  Appellant Br. 39–41.

However, Ohio's important interests in preferring childbirth to abortion, promoting life, and not subsidizing abortions have only the most tenuous relationship to § 3701.034.  Precluding Plaintiffs from funding under the six federal preventive-health programs that have nothing to do with abortion does little to promote these interests.  Separate and apart from § 3701.034, no program funds are or can be used to perform, promote or support abortion.  *See McRae*, 448 U.S. at 303.  Nor does ODH's asserted interest in preventing entanglement between program services and abortion services have any weight, since the six government programs have nothing to do with abortion and there is no evidence of a history of entanglement.  Regarding the administrative burden of "costly oversight and audits," ODH neither cites the record nor points to evidence in support.

---

[14]Citing *Whole Woman's Health* and *Casey*, Plaintiffs correctly assert that Ohio indisputably could not ban PPGOH and PPSWO from providing "nontherapeutic abortions."  Appellees Br. 35.

**B.**

ODH argues that § 3701.034's "conduct provision" neither directly nor indirectly imposes *any* burden on a woman's right to an abortion.  Appellant Br. 36–38.

ODH does not contest that if Plaintiffs acquiesce in the unconstitutional conditions by ceasing all abortion activity and advocacy in favor of continuing to participate in the six federal programs, women in Ohio will suffer an undue burden on their ability to obtain legal abortions. Relying on deposition testimony regarding funding for Plaintiffs' various activities, ODH argues that Plaintiffs will not abandon their abortion activities, and thus women's abortion rights will not be unduly burdened.  ODH cites no case in support of its argument that a plaintiff who establishes an unconstitutional condition must also show that it would yield to the unconstitutional coercion.  ODH's argument sidesteps that the Supreme Court has recognized that the unconstitutional-conditions doctrine prohibits the imposition of the *condition itself*.  *See AOSI*, 570 U.S. at 214 (government action need not be "actually coercive" to constitute an unconstitutional condition).

ODH further argues that abortion rights are different because the right belongs to women, not their health-care providers, and although Plaintiffs might be disadvantaged, § 3701.034 does not unduly burden women's right to access abortion because Plaintiffs will continue to operate as usual.  It has been recognized repeatedly that because the abortion right depends on providers to offer the service, conditions on abortion providers inherently affect women seeking abortions. *See Singleton v. Wulff*, 428 U.S. 106, 117 (1976) (observing that since a woman "cannot safely secure an abortion without the aid of a physician," "the constitutionally protected abortion decision is one in which the physician is intimately involved," and "[a]side from the woman herself, therefore, the physician is uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against, that decision."); *Planned Parenthood of Mid-Mo. & E. Kan.*, 167 F.3d at 464 (addressing the effect of the challenged Missouri law on "Planned Parenthood's constitutional right[]" to "provide abortion services"); *Planned Parenthood of Cent. & N. Ariz.*, 718 F.2d at 944 (determining "whether the State unduly interfered with Planned Parenthood's exercise of its right to perform abortion and abortion-related services").

Further, there is no complete separation between the Plaintiff providers and their patients that ODH would have us accept. Although Plaintiffs' choice to resist ODH's unconstitutional attempt to coerce them to abandon all abortion activity and advocacy means that women in Ohio will not suffer the drastic reduction in abortion services that would have occurred if Plaintiffs had made a different choice, § 3701.034 still has a substantial effect on women, in addition to providers. It is undisputed that Plaintiffs are among the largest providers of health services in the areas their twenty-seven clinics serve under the federal programs at issue,[15] and provide many of those services free of charge to low-income and underserved communities.[16] If Plaintiffs are excluded from the federal programs, they will no longer be able to provide the services for free.[17] Thus, as a condition of retaining access to abortion free of undue governmental interference, Ohio women must forego the extensive and subsidized access to health services under federal programs that they previously enjoyed. Although Ohio women do not have a right to the programs, they do have a right not to have their access to important health services curtailed because their major abortion providers opted to protect women's abortion rights rather than yield to unconstitutional conditions.

---

[15] Plaintiffs provide more than half of all STD tests administered in Ohio under the STD Prevention Program. PID 1858/Wolfson Decl. exhibit 26; PID 302/Lawson 2d Decl. ¶ 2. In the fiscal year that ended in June 2015, PPGOH provided approximately 64,300 STD tests and treatment for patients who tested positive and required treatment. PID 89/Harvey Decl. ¶ 10. Of the 90,000 STD tests that PPGOH administers annually, approximately 64,300 are funded through the STD Prevention Program. PID 89/Harvey Decl. ¶ 24. PPSWO provides approximately 7,943 STD tests and 1,150 treatments annually. PID 130/Lawson Decl. ¶ 22.

PPGOH is the largest provider of HIV testing and treatment in Cleveland, Akron, and Canton. PID 92/Harvey Decl. ¶ 38. PPSWO provides approximately 1,600 anonymous and confidential HIV tests annually. PID 132/Lawson Decl. ¶ 31.

PPGOH also provided 4,400 pap smears and 3,700 breast exams. PID 85/Harvey Decl. ¶ 10.

ODH failed to identify alternative providers to fill most of the gaps in service that would result from excluding Plaintiffs from funding under the six federal programs. PID 1858/Wolfson Decl. exh. 26.

[16] Approximately 75% of PPSWO's patients and 40% of PPGOH's patients fall within the low-income classification. PID 127/Lawson Decl. ¶ 10; PID 87/Harvey Decl. ¶ 19. Many live in medically underserved areas—communities classified by the U.S. Department of Health and Human Services as having too few primary-care providers, high infant mortality and poverty rates, or large elderly populations. See PID 85/Harvey Decl. ¶ 11; PID 127/Lawson Decl. ¶ 10.

[17] PID 952/Harvey 3d Decl. ¶ 6 ("Without funding from those programs [§ 3701.034 reaches], PPGOH will be constrained in its ability to offer free services, such as screening for sexually transmitted diseases, HIV, and breast and cervical cancer, and end the affected education programs.")

## V.  FIRST AMENDMENT CLAIM

We turn to ODH's argument that § 3701.034's speech provision, which prohibits the allocation of program funds to any entity that *promotes* abortions, does not violate the First Amendment.  Appellant Br. 49–55.

In some cases, a funding condition can result in an unconstitutional burden on First Amendment rights.  *See AOSI*, 570 U.S. at 218 ("By requiring recipients to profess a specific belief, the Policy Requirement goes beyond defining the limits of the federally funded program to defining the recipient."); *Rumsfeld*, 547 U.S. at 59 (the First Amendment supplies "a limit on Congress' ability to place conditions on the receipt of funds").

### A.

As discussed, ODH is correct that states are free to "make a value judgment favoring childbirth over abortion, and . . . implement that judgment by the allocation of public funds." PID 2129, citing *Maher*, 432 U.S. at 474; *see also McRae*, 448 U.S. at 302.  For decades Ohio legislation has been in place that bars the use of public funds to pay for abortion services.  PID 2129, citing Ohio Rev. Code § 5101.56 (providing that "[u]nless required by the United States Constitution or by federal statute, or decisions of federal courts, state or local funds may not be used for payment or reimbursement for abortion services" unless certain circumstances apply, none applicable here).  Plaintiffs accept this as a given.

Relying on *Planned Parenthood Ass'n of Hidalgo County Texas, Inc. v. Suehs*, 692 F.3d 343 (5th Cir. 2012), ODH argues that § 3701.034's speech provision does no more than is constitutionally permissible by seeking "to ensure that contractors who convey Ohio's messages do so efficiently and effectively," Appellant Br. 52–53.  In *Suehs*, the Texas legislature created the "Women's Health Program (WHP)," 2005 Tex. Gen. Laws 2817, 2871, in 2005, which was designed to "expand access to preventative health and family planning services for women." 692 F.3d. at 346 (citation omitted).  Since the WHP's inception, the Texas Legislature prohibited the Texas Health and Human Services Commission (THHSC), which administers the WHP, from contracting with "entities that perform or promote elective abortions or are affiliates that perform or promote elective abortions."  *Id*. at 346 (citation omitted).  However, THHSC did not exclude

Planned Parenthood from receiving WHP funds until 2011, when the Texas Legislature re-authorized the WHP and promulgated regulations. The plaintiff health-clinic operators alleged that the regulations violated their First Amendment rights of free-speech and association, and the guarantee of Equal Protection. Applying the unconstitutional-conditions doctrine, the district court determined the regulations likely violated these constitutionally guaranteed rights and issued a preliminary injunction. The Fifth Circuit vacated the district court's order granting a preliminary injunction and remanded, explaining:

> We begin with the restriction on promoting elective abortions. The THHSC regulations exclude health care providers from the WHP who "promote [ ] elective abortions as . . . abortion facilit[ies] licensed under [the] Health and Safety Code." 1 Tex. Admin. Code § 354.1363(a)(2)(A). This restriction, in a sense, imposes a speech-based condition on organizations receiving the benefit of WHP funding. If an organization wishes to receive WHP funding, it may not "[a]dvocate[ ] or popularize[ ] [elective abortions] by, for example, advertising or publicity" as a licensed abortion facility. *Id.* § 354.1362(6). Although this restriction functions as a speech-based funding condition, it also functions as a direct regulation of the content of a state program, and is therefore constitutional under the reasoning of *Rust v. Sullivan*, 500 U.S. 173 [] (1991). In *Rust v. Sullivan*, the Supreme Court considered federal regulations limiting the abortion-related speech of clinics receiving funds under Title X of the Public Health Service Act. 500 U.S. at 178 []. The disputed regulations broadly prohibited a Title X project from promoting or advocating abortion as a method of family planning, including advocating abortion in the political arena. *Id.* at 180 []. The Court upheld the regulations, reasoning that the government could disfavor abortion within its own subsidized program, and that exclusively subsidizing non-abortion family planning speech did not penalize abortion speech. *Id.* at 192–93 []. Subsequent opinions have recognized *Rust* as affirming the government's authority to enact viewpoint-based restrictions on speech when the government is, in effect, the speaker. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 540–41 [] (2001); *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 [] (1995). "[W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes." *Rosenberger*, 515 U.S. at 833 [] (citing *Rust*, 500 U.S. at 194 []). . . .
>
> . . . . We hold that Texas may deny WHP funds from organizations that promote elective abortions. This specific restriction on the breadth of the program functions as a direct regulation of the definitional content of a state program, and it is therefore unnecessary to examine it within the framework of the unconstitutional conditions doctrine. The district court erred in enjoining this provision of the regulations.

*Suehs*, 692 F.3d 343, 349–50.

We agree with the district court that *Suehs* is distinguishable and inapposite:

Defendant points out that even though Texas's funding condition applied to program participants, rather than just program activities, the Fifth Circuit found the funding restriction was proper. However, there are key differences between Section 3701.034 and the WHP, as the [Fifth Circuit's] explanation of its holding illustrates:

> Texas's restriction on promoting elective abortions directly regulates the content of the WHP as a state program. The policy expressed in the WHP is for public funds to subsidize non-abortion family planning speech to the exclusion of abortion speech. § 1.19(b), 2011 Tex. Gen. Laws at 335. Texas's authority to promote that policy would be meaningless if it were forced to enlist organizations as health care providers and message-bearers that were also abortion advocates. The authority of Texas to disfavor abortion within its own subsidized program is not violative of the First Amendment right, as interpreted by *Rust v. Sullivan*. Consequently, Texas's choice to disfavor abortion does not unconstitutionally penalize the appellees' speech.

[692 F.3d] at 350. In contrast, Section 3701.034 is not a direct regulation of the content of a state program. Instead, Section 3701.034 places the speech-based funding condition on the recipient of the funds [based on] activities conducted outside the six programs impacted . . . As a result, Section 3701.034 does not "leave the grantee unfettered in its other activities." *Rust*, 500 U.S. at 196.

*Planned Parenthood of Greater Ohio*, 201 F. Supp. 3d at 905.

## B.

We also reject ODH's related argument that the State of Ohio may, consistent with the First Amendment, ensure that its message favoring childbirth over abortion is not garbled. As the district court found, this case involves no state "message" related to or regarding abortion; § 3701.034 affects programs that have nothing to do with abortion or family planning, and seeks to impose restrictions on recipients' speech outside the six government programs the statute funds. PID 2132/Dist. Ct. Op.; *see, e.g., AOSI*, 570 U.S. at 218 (a recipient of government funding is free under the First Amendment to express its own views "when participating in activities on its own time and dime").

**C.**

As the district court determined, because "the conditions imposed by Section 3701.034 seek to leverage funding to regulate speech <u>outside</u> the contours of the six programs impacted by Section 3701.034," the unconstitutional-conditions doctrine applies. *Planned Parenthood of Greater Ohio*, 201 F. Supp. 3d at 906 (emphasis added). Nothing within the scope of these six programs relates to performing or promoting abortion. Therefore, the district court correctly determined that § 3701.034 cannot condition participation in funding for these programs on a recipient's foregoing the exercise of its rights of free speech or association outside these programs. PID 2133. *Accord Dempsey*, 167 F.3d at 462 ("Legislation that simply dictates the proper scope of government-funded programs is constitutional, while legislation that restricts protected grantee activities outside government programs is unconstitutional[.]"); *Planned Parenthood of Cent. & N. Ariz. v. Ariz.*, 718 F.2d 938, 942–44 (9th Cir. 1983) (although the state need not fund abortions, the state "may not unreasonably interfere with the right of Planned Parenthood to engage in abortion or abortion-related speech activities"); *Hill v. Kemp*, 645 F. Supp. 2d 992, 1002 (N.D. Okla. 2009) ("The State is free to fund adoption services to exclusion of any abortion-related services, but it may not deny [the plaintiff motorists and non-profit pro-choice association] funding [for specialty license plate fees] conditioned upon [the plaintiff's] waiver of its right to engage in protected speech activity with its private funds."); *see also In re Tam*, 808 F.3d 1321, 1348–50 (Fed. Cir. 2015), as corrected (Feb. 11, 2016), *aff'd sub nom. Matal v. Tam*, 137 S. Ct. 1744 (2017) ("The government's discretion to direct its spending, while broad, is not unbounded, and the limits take account of the real-world effect on the speech of those subject to the conditions. If a program arises under the Spending Clause, Congress is free to attach 'conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize.' *Agency for Int'l Dev.* [*AOSI*], 133 S. Ct. at 2328. However, Congress does not have the authority to attach 'conditions that seek to leverage funding to regulate speech outside the contours of the program itself.' *Id.*").

The district court correctly determined that § 3701.034 violates Plaintiffs' rights of free speech and association.

## VI.  ENTRY OF PERMANENT INJUNCTION

In its Reply Brief ODH states simply that it "agrees that if this Court finds the Conduct and Speech Provisions both unconstitutional," the permanent injunction factors are met, Reply Br. 29, thus we do not address the issue further.

## VII.

For the reasons stated, we AFFIRM the district court's grant of Plaintiffs' motions for judgment on the merits and for a permanent injunction.